1  STEVEN N. HOLLAND /CA SB # 132321
   TODD A. WILLIAMS /CA SB # 197489
2  MORGAN MILLER BLAIR, A LAW CORPORATION
   1331 N. California Blvd., Suite 200
3  Walnut Creek, CA 94596-4544
   Telephone:    (925) 937-3600
4  Facsimile:    (925) 943-1106
   twilliams@mmblaw.com
5
   TIMOTHY J. HOBAN /CA SB # 192461
6  REGIONAL COUNSEL FOR TOLL BROS., INC.
   725 W. Town and Country Rd., Suite 500
7  Orange, CA 92868
   Telephone:    (714) 347-1300
8  Facsimile:    (714) 835-9683
   thoban@tollbrothersinc.com
9
   Attorneys for Plaintiff TOLL BROS., INC.,
10 A Pennsylvania corporation

11              **UNITED STATES DISTRICT COURT**

12          **NORTHERN DISTRICT OF CALIFORNIA**

13          **SAN FRANCISCO/OAKLAND DIVISION**

14 TOLL BROS., INC., a Pennsylvania            CASE NO:
   corporation,
15
16              Plaintiff,                     **COMPLAINT FOR:**

17      v.                                     **1. DECLARATORY RELIEF
                                                  (CONTRACT OBLIGATIONS); AND**
18 CITY OF RICHMOND, a California Charter
   City; RICHMOND REDEVELOPMENT             **2. DECLARATORY RELIEF
19 AGENCY, a public body, corporate and politic,    (CONTRACT VOID)**
   and DOES 1 through 20, inclusive,
20
                Defendants.
21
22
23
24
25
26
27
28

**COMPLAINT FOR DECLARATORY RELIEF**

1 Plaintiff Toll Bros., Inc. ("**Plaintiff**" or "**Toll**") alleges as follows:

## THE PARTIES

2    1.    Plaintiff Toll Bros., Inc. is a Pennsylvania corporation, duly organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Horsham, Pennsylvania.

6    2.    Toll is informed and believes and based thereon alleges that defendant the City of Richmond ("**City**") is and at all relevant times was, a charter city organized and existing under the laws of the State of California.

9    3.    Toll is informed and believes and based thereon alleges that defendant the Richmond Redevelopment Agency ("**Agency**") is and at all relevant times was, a public body, corporate and politic, formed under the laws relating to Redevelopment Agencies pursuant to the California Health and Safety Code.

13    4.    The true names and capacities of Defendants Does 1 through 20 are unknown to Plaintiff, who will amend this complaint to insert their true names and capacities when Plaintiff has ascertained them. Plaintiff is informed and believes and on that basis alleges that at all relevant times, each of the Defendants, including Does 1 through 20, were the agents or employees of each of the remaining Defendants, and, while acting within the scope and course of that agency or employment, took part in the acts and omissions alleged in this complaint. Plaintiff is informed and believes and on that basis alleges that Does 1 through 20 are responsible or liable in some manner for the occurrences alleged in this complaint. Each charging allegation in this complaint, and each reference to "Defendant," "City," or "Agency" refers to both the named Defendants, and to Defendants Does 1 through 20.

## JURISDICTION AND VENUE

24    5.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C. Section 1332. Plaintiff is a corporation incorporated under the laws of the State of Pennsylvania, with its principal place of business in the State of Pennsylvania. All Defendants are citizens of the State of California. Also, the amount in controversy exceeds $75,000, exclusive of costs and interest.

///

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

1

**COMPLAINT FOR DECLARATORY RELIEF**

6. Venue is proper in the Northern District of California because the contract at issue was entered into, the property that is the subject of this action is located, and the Defendants' wrongful acts alleged herein took place within this Court's District. As such, venue is proper here pursuant to 28 U.S.C. §1391(a)(2) & (b)(2), and all applicable laws.

## GENERAL ALLEGATIONS

### THE POINT RICHMOND SHORES PROJECT

7. The Point Richmond Shores Project involves a 13.8 acres of land located on the San Francisco Bay that is within and owned by the City, commonly known as Terminal One ("**Terminal One**" or the "**Property**").

8. After Toll successfully responded to a February 2003 Request for Proposal, Toll and the City entered into an Exclusive Right to Negotiate Agreement, and Toll paid the City a $100,000.00 Initial Deposit ("**Initial Deposit**"). In October 2003, Toll and the City and Agency signed and are parties to a Land Disposition Agreement concerning Terminal One ("**LDA**"). A true and correct copy of the LDA, as currently amended, is attached hereto as **Exhibit 1**.

9. The LDA contemplates the sale of roughly 11.9 acres of Terminal One to Toll ("**Residential Property**") after Terminal One was environmentally remediated by the City and/or Agency (sometimes referred to collectively as "**Sellers**"), and after the Residential Property was established as a legal parcel separate from the remaining 1.9 acres of Terminal One, *inter alia.* Toll hoped to develop the 11.9 acre Residential Property as part of the Point Richmond Shores project ("**Project**"), and anticipated installing park improvements on the remaining 1.9 acres of Terminal One ("**Park Property**"), which the City would retain.

10. Pursuant to the LDA, Toll paid the City a $1,000,000.00 Additional Deposit on or about April 14, 2004 ("**Additional Deposit**").

11. Toll has actively pursued the Project, spending millions in development fees and costs ("**Development Costs**") on top of the $1,100,000.00 in deposits paid to the City.

///

///

///

Morgan
Miller
Blair,
a
law
corporation

2

COMPLAINT FOR DECLARATORY RELIEF

**DEFENDANTS REFUSE TO COMPLETE THEIR ENVIRONMENTAL
REMEDIATION OBLIGATIONS REQUIRED BY THE LDA**

12.    Under the LDA, the City and Agency have significant obligations to complete environmental remediation work at Terminal One.  In fact, Section 3.5.1 requires that:

> [T]he Redevelopment Agency shall, *at the Redevelopment Agency's sole cost ... complete or cause the completion* of such investigation, response, and Redevelopment Agency Remediation activities with respect to Hazardous Substances in, on under, about or emanating from the Property as may be required by the RWQCB, or any other governmental agency with jurisdiction to protect human health and the environment, in order to render (1) the Residential Property suitable for residential development consistent with the existing General Plan designation and all applicable health and safety requirements and (2) the Park Property suitable for park and recreational uses consistent with the existing General Plan designation and all applicable health and safety requirements and suitable for residential use on the adjacent Residential Property.  The Redevelopment Agency will take these actions to render the Residential Property suitable for residential development consistent with the existing General Plan designations and all applicable health and safety requirements, independently of its obligations under this Agreement, to maintain flexibility for the future redevelopment of the Property, whether under this Agreement or other reuse scenarios.

*See* **Exhibit 1**, p. 10, ¶ 3.5.1 (italics added).  Section 4.3.2 of the LDA further requires that the Agency complete the remediation as evidenced by a written confirmation from the Regional Water Quality Control Board ("**RWQCB**") that no further action is required to, among other things, render the property suitable for residential development.

13.    The Agency has not completed the work required by Section 3.5.1, particularly with respect to remedial actions required by the RWQCB*, inter alia.*  The RWQCB has provided notice to the Agency that significant portions of the remediation is not complete, and that it will not consider issuance of a final confirmation that the work is complete until, among other things, implementation of the soils management protocols for petroleum impacted soils is complete.  The Agency now contends, however, that the LDA does not require it to perform this work.  By letter dated 10/22/07, Sellers unilaterally declared that the "Agency has completed its remediation of soils to residential standards," thereby repudiating a significant portion of their remediation obligations.  A true and correct copy of that letter is attached hereto as **Exhibit 2**.

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

3

1  Toll objected to this assertion in a detailed November 26, 2007 letter. A true and correct copy of

2  Toll's letter is attached hereto as **Exhibit 3**.

3      14.    The City and Agency have not responded in writing to the November 26, 2007

4  letter, nor have they retracted or modified their unfounded position. There remains a controversy

5  and dispute over scope of the Agency's remediation obligations under the LDA.

6      **THE LDA IS VOID AS A MATTER OF LAW**

7      15.    Toll's obligation to purchase the Residential Property is conditioned upon the

8  Residential Property being established as a separate legal parcel, or Toll's "waiver" of that

9  condition, *inter alia. See* **Exhibit 1**, p. 14, ¶ 4.3. Because the LDA allows for such a "waiver,"

10  it violates Section 66499.30(e) of California's Subdivision Map Act ("**SMA**" (CAL. GOV'T CODE

11  §§ 66410–66499.37)). Specifically, the LDA states as follows:

12          3.3    Legal Parcel. The Developer [Toll], at its own cost, shall
13  survey the Property, and take all necessary steps to apply to the City for a
        Certificate of Compliance regarding the establishment of the Residential
14          Property as a separate legal parcel as part of the Entitlement process . . . .

        4.3    Developer's Conditions to Close of Escrow. Developer's
15  obligations to close Escrow and purchase the Residential Property are
        conditioned upon the satisfaction *or waiver* of the following conditions:
16
        4.3.1    Legal Parcel. The creation of the Residential Property
17          as a legal parcel prior to or at Close of Escrow in accordance with
        Section 3.3 provided that Developer has taken all good faith efforts to
18          apply for the creation of such legal parcel at the times required by this
        Agreement.
19

20      *See* **Exhibit 1**, p. 9, ¶ 3.3, and p. 14, ¶ 4.3 (italics added). As such, the LDA contains an

21  option to waive the SMA's requirement that a legal parcel be created, and to allow the close of

22  escrow even if one is not created. Compliance with the SMA is thus optional, which is

23  prohibited under California Government Code § 66499.30(c).

24      16.    On or about July 31, 2008, Toll informed Sellers of Toll's understanding that the

25  LDA is void under the SMA and requested that Sellers confirm the same. Sellers have not

26  responded to that letter. On information and belief, Sellers contend that the LDA is not void

27  under the SMA.

28      17.    Toll brings this suit within the time periods permitted by law.

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

4

**COMPLAINT FOR DECLARATORY RELIEF**

1

## FIRST CAUSE OF ACTION
### (Declaratory Relief - Contractual Obligations)
### (Against All Defendants)

2

3      18.    Plaintiff incorporates by reference the allegations contained in the preceding

4   paragraphs of this Complaint as though set forth in full at this place.

5      19.    An actual and justiciable controversy now exists between Toll and Defendants

6   with respect to the City's and Agency's environmental remediation obligations under the LDA as

7   alleged above and hereafter.  Specifically, Toll contends that the Agency is required to complete

8   the remediation work in accordance with Section 3.5.1 of the LDA as evidenced by a written

9   confirmation from the Regional Water Quality Control Board that no further action is required

10  to, among other things, render the property suitable for residential development.  This includes,

11  among other things, implementation of soils management protocols for petroleum-impacted

12  soils.  Sellers contend that the LDA does not require them to perform this work.

13     20.    Based on the allegations above, Toll desires a judicial declaration as to the

14  validity of its contentions, including that the LDA requires the Agency to complete the

15  remediation work in accordance with Section 3.5.1 of the LDA, including, among other things,

16  implementation of soils management protocols for petroleum-impacted soils, as evidenced by a

17  written confirmation from the Regional Water Quality Control Board that no further action is

18  required to, among other things, render the property suitable for residential development.  Such a

19  judicial declaration is necessary and appropriate at this time so that the parties may ascertain

20  their rights and duties in connection with the matters herein alleged, and to avoid a multiplicity

21  of actions.

22     WHEREFORE, Toll prays judgment as set forth below.

23

## SECOND CAUSE OF ACTION
### (Declaratory Relief – Contract Void Due to Illegality)
### (Against All Defendants)

24

25     21.    Plaintiff incorporates by reference the allegations contained in the preceding

26  paragraphs of this Complaint as though set forth in full at this place.

27     22.    An actual and justiciable controversy now exists between Toll and Defendants

28  with respect to whether the LDA is void as a matter of law, as alleged above and hereafter.

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

5

COMPLAINT FOR DECLARATORY RELIEF

23.    At the time the parties entered into the LDA, the Residential Property was not subdivided, and did not constitute a separate legal parcel. The LDA allowed the parties to complete the sale and purchase if the Residential Property was made into a legal parcel or if the parties waived that condition.

24.    Sections 66499.30 (a) and (b) of the SMA prohibit the sale of land that is not subdivided. However, a contract for the sale of unsubdivided land can be valid if it falls within the narrow exception stated in Section 66499.30(e) by being "expressly conditioned" upon compliance with the SMA. The LDA does not fit within this narrow exception. By giving a party the option to waive the creation of a legal parcel under the SMA, the LDA fails to comply with section 66499.30(e) and is therefore void.

25.    Toll is informed and believes and based thereon alleges that the City and Agency disagree with the assertion that the LDA is void.

26.    If the LDA is void, it must be rescinded. For that reason, Toll offers to restore to the City and Agency every thing of value Toll received from the City or Agency under the LDA, if anything was so received, on the condition that they do likewise in favor of Toll.

27.    Based on the allegations above, Toll desires a judicial declaration as to whether the LDA is void for failing to comply with the SMA. Such a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and duties in connection with the matters herein alleged, and to avoid a multiplicity of actions.

28.    If the LDA is void then Toll is entitled to recover the following restitution, reimbursement, and/or damages:

(a)    Return of the $100,000.00 Initial Deposit and $1,000,000.00 Additional Deposit, plus interest thereon;

(b)    Return of all Development Costs, including, but not limited to, all sums Toll incurred in connection with the entitlement of the Property that have enriched Defendants;

(c)    Consequential damages, according to proof, *inter alia*; and

(d)    Attorneys' fees and costs according to proof.

WHEREFORE, Plaintiff prays judgment as set forth below.

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

6

COMPLAINT FOR DECLARATORY RELIEF

1

### PRAYER FOR RELIEF

2

#### ON PLAINTIFF'S FIRST CAUSE OF ACTION

3        1.      For a judicial declaration that the City and Agency are obligated to complete the

4    environmental remediation of Terminal One as specified in the LDA and reaffirmed by Toll in

5    its November 26, 2008 letter, and otherwise, before Toll is obligated to complete the purchase

6    under the LDA.

7

#### ON PLAINTIFF'S SECOND CAUSE OF ACTION

8        2.      For a declaration that the LDA is void for the reasons set forth in this Complaint;

9    and for other appropriate relief;

10        3.      For rescission of the LDA;

11

#### ON ALL CAUSES OF ACTION

12        4.      For the return of Toll's Initial Deposit and Additional Deposit totaling

13    $1,100,000.00, plus interest;

14        5.      For the payment of restitution, reimbursement, and/or damages, including,

15    without limitation, all consequential damages and Toll's Development Costs, according to proof.

16        6.      For actual attorneys' fees, expert fees and litigation expenses pursuant to Section

17    10.7 of the LDA, and applicable law;

18        7.      Payment of escrow and title cancellation fees; and

19        8.      For costs of suit, and such other and further relief as the court or a jury may deem

20    just or proper.

21    DATED:  July 31, 2008                    MORGAN MILLER BLAIR, A LAW CORPORATION

22

23                                    By:   _____

24                                          STEVEN N. HOLLAND
                                          Attorneys for Plaintiff

25                                          TOLL BROS., INC.

26

27

28

MORGAN
MILLER
BLAIR,
A
LAW
CORPORATION

7

**EXHIBIT 1**

# Land Disposition Agreement

# City of Richmond,

# Richmond Redevelopment Agency

# and

# Toll Bros., Inc.

733\12\172152.9

## TABLE OF CONTENTS

1.    DEFINITIONS...................................................................................................3

2.    PURCHASE AND SALE....................................................................................6
      2.1    Agreement to Buy and Sell ......................................................................6
      2.2    Purchase Price...........................................................................................6
      2.3    Access        .................................................................................................7

3.    ACTIONS PENDING CLOSE OF ESCROW. ....................................................8
      3.1    Title Review  .............................................................................................8
      3.2    Title Policy   .............................................................................................9
      3.3    Legal Parcel ...............................................................................................9
      3.4    Street Vacations/Closures.........................................................................9
      3.5    Redevelopment Agency Remediation......................................................10
      3.6    Demolition of Warehouse on Park Property.............................................11
      3.7    State Lands  .............................................................................................11
      3.8    Entitlement Process. ................................................................................12

4.    ESCROW AND CLOSE OF ESCROW..............................................................14
      4.1    Opening of Escrow ..................................................................................14
      4.2    Escrow Fees and Other Charges..............................................................14
      4.3    Developer's Conditions to Close of Escrow ............................................14
      4.4    City's Conditions to Close of Escrow.......................................................16
      4.5    Closing Date .............................................................................................16
      4.6    Close of Escrow Documents ....................................................................16
      4.7    Close of Escrow. ......................................................................................17
      4.8    Failure to Close; Termination. .................................................................17
      4.9    Physical Condition of Residential Property. ............................................18

5.    DEVELOPMENT OBLIGATIONS. .....................................................................19
      5.1    Commencement of Construction...............................................................20
      5.2    Building Permit.........................................................................................20
      5.3    Completion of Construction......................................................................20
      5.4    Offsite Construction Obligations..............................................................20
      5.5    Affordable Housing ..................................................................................21
      5.6    Equal Opportunity ....................................................................................21
      5.7    Compliance with Richmond Municipal Code Chapter 2.56 and First
             Source Hiring...........................................................................................21
      5.8    Prevailing Wages .....................................................................................21
      5.9    Compliance with Applicable Law..............................................................22
      5.10   Progress Reports .....................................................................................23
      5.11   Use and Maintenance ..............................................................................23
      5.12   Sales and Use Tax Allocations. ..............................................................23

6      REPRESENTATIONS, WARRANTIES AND COVENANTS..........................................23
       6.1    City's Representations, Warranties and Covenants......................................23
       6.2    Developer's Representations and Warranties................................................25

7      CONDEMNATION ..............................................................................................26

8      REMEDIES. ........................................................................................................27
       8.1    Default       .......................................................................................................27
       8.2    Right of Reverter.............................................................................................27
       8.3    Option to Purchase, Enter and Possess ......................................................29
       8.4    Plans, Data and Approvals............................................................................29

9      MORTGAGE PROTECTION. ...............................................................................30
       9.1    Interest Covered by Mortgage........................................................................30
       9.2    Rights Subject to Agreement ..........................................................................30
       9.3    Mortgagee Not Obligated to Construct Improvements ...................................30
       9.4    Notice of Default to Mortgagee: Right to Cure ..............................................31
       9.5    Right of the Redevelopment Agency and City to Cure Mortgage Default. ..........32

10     GENERAL PROVISIONS......................................................................................33
       10.1   Notice, Demands and Communication............................................................33
       10.2   Conflict of Interests .......................................................................................35
       10.3   Non-Liability of Officials, Employees and Agents ..........................................35
       10.4   Legal Advice ..................................................................................................35
       10.5   Time of the Essence ......................................................................................35
       10.6   Force Majeure ...............................................................................................35
       10.7   Attorneys' Fees .............................................................................................35
       10.8   Assignment ...................................................................................................36
       10.9   City Regulatory Authority ...............................................................................36
       10.10  Program Management ....................................................................................36
       10.11  No Partnership or Joint Venture.....................................................................37
       10.12  Inspection of Books and Records ..................................................................37
       10.13  Provisions Not Merged with Deeds ...............................................................37
       10.14  Title of Parts and Sections ............................................................................37
       10.15  Indemnity .....................................................................................................37
       10.16  Insurance ......................................................................................................38
       10.17  Real Estate Commission................................................................................38
       10.18  Rights and Remedies Cumulative..................................................................38
       10.19  Waiver of Covenants, Conditions or Remedies..............................................38
       10.20  Severability ...................................................................................................38
       10.21  Choice of Law/Venue.....................................................................................39
       10.22  Recordation of Agreement/Filing of Notices...................................................39
       10.23  Action by the City and Redevelopment Agency ..............................................39
       10.24  No Third-Party Beneficiaries ..........................................................................39
       10.25  Amendments..................................................................................................39

733\12\172152.9                                    ii

10.26 Operating Memoranda ................................................................. 39
10.27 Identity and Authority ................................................................. 40
10.28 Counterparts ................................................................................ 40
10.29 Entire Understanding of the Parties ........................................... 40

| | |
|---|---|
| Exhibit A | Residential Property Description |
| Exhibit B | Site Map |
| Exhibit C | Scope of Development |
| Exhibit D | Schedule of Performance |
| Exhibit E | Memorandum of Agreement |
| Exhibit F | Grant Deed |
| Exhibit G | Document Schedule |
| Exhibit H | Insurance Provisions |

# LAND DISPOSITION AGREEMENT

This LAND DISPOSITION AGREEMENT (the "Agreement") is made and entered into as of October 31, 2003, by the City of Richmond, a charter city (the "City"), the Richmond Redevelopment Agency, a public body, corporate and politic (the "Redevelopment Agency"), and Toll Bros., Inc., a Pennsylvania corporation (the "Developer").

## RECITALS

A.    These Recitals utilize certain capitalized terms which are defined in Section 1 of this Agreement.

B.    City is the owner of certain real property in the City of Richmond, Contra Costa County ("County"), California, comprised of approximately 13.8 acres, commonly known as the Terminal One property, more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein (the "Property").  Pursuant to Article II (Powers), Section 1 of the City Charter of the City of Richmond, the City has the power to dispose of its real property.

C.    The Property is within the Project Area.  The Redevelopment Plan for the Project Area was the subject of a final Environment Impact Report certified by the City on June 15, 1999.

D.    The Property has been designated in City's general plan for "Water Related Commerce" and "Commercial Recreation" uses, which among other uses, allows residential use with a range of 9 to 21 units per net buildable acre within the Property upon the issuance of applicable permits or approvals.

E.    The Redevelopment Agency is charged with the alleviation of blight within Project Area.  As part of the Redevelopment Agency's blight alleviation responsibilities, it is charged with facilitating the planning, and redevelopment of the Property pursuant to the Redevelopment Plan, and is authorized to remediate the Property pursuant to Health and Safety Code Section 33459 <u>et seq</u>.  Redevelopment of the Property will further the goals and objectives of the Redevelopment Plan.

F.    In light of administrative directives from the Regional Water Quality Control Board, and independent of any redevelopment of the Property, the Property needs remediation related to Hazardous Substances, and the Redevelopment Agency is studying the feasibility and potential environmental impacts of remediation of Hazardous Substances on the Property.  Any remediation for Hazardous Substances related to the Property is to be performed by the Redevelopment Agency pursuant to Section 3.5 ("Redevelopment Agency Remediation").  The Redevelopment Agency also plans to demolish the existing warehouse structure on the Park Property pursuant to Section 3.6

(the "Redevelopment Agency Demolition"). The Redevelopment Agency Demolition and the Redevelopment Agency Remediation shall not include any renovations of the pier for use as a pier other than removal of the warehouse buildings and shall not include any of the park improvements to be installed by Developer as Offsite Improvements on the Park Property.

G.     In response to Richmond's February 2003 request for proposals (the "RFP"), Developer submitted its proposal to acquire a portion of the Property and after acquisition develop the Property on March 7, 2003 (the "Proposal"). Pursuant to the Proposal, Developer proposes to acquire a roughly 11.9 acre portion of the Property (the "Residential Property") for the development of 242 to 289 for sale, market rate, podium-based (subject to Other Agency Approvals) residential units and related amenities and Developer further proposes to develop various recreational and other facilities, including but not limited to, an approximately 1.9 acre public park on the portion of the Property to be retained under City ownership ("Park Property") and the improvement of Brickyard Cove Road from Dornan Drive to Sea Cliff Estates Consistent with Minimum Project Expectations. The approximate locations of the Residential Property and the Park Property are shown on the Site Map attached as <u>Exhibit B</u>.

H.     On May 13, 2003, Developer was selected through a competitive process by the City to enter into exclusive negotiations with the City over the terms and conditions under which the Developer will purchase and develop the Residential Property and develop the park improvements on the Park Property. Developer, City and Redevelopment Agency entered into an Exclusive Right to Negotiate Agreement effective June 30, 2003, as amended (the "ERNA") providing for a period of exclusive negotiations and setting out certain proposed terms for this Agreement. In accordance with the ERNA, Developer made a nonrefundable $100,000.00 deposit to the City.

I.     The type, size and quality of the Project that Developer intends to build, including the minimum expectations of Developer with respect to approvals for the Project, are reflected in the Scope of Development attached as <u>Exhibit C</u> (the "Project"). The parties recognize that the environmental impacts of the Project and other matters must be evaluated and addressed before any final Project approvals may be granted, that the approvals are at the discretion of the approving agencies, including the City in its capacity as a regulatory agency and that the City is under no obligation whatsoever to approve a Project which meets or exceeds Developers' minimum expectations.

J.     City desires to sell the Residential Property to Developer, and Developer desires to purchase the Residential Property from City and both parties desire that the Developer install park improvements on the Park Property, all in accordance with the terms and conditions contained in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Developer, City and Redevelopment Agency agree as follows:

733\12\172152.9                                    2

AGREEMENT

1. DEFINITIONS.

In this Agreement, the following terms shall each have the respective following meanings:

"Additional Deposit" shall have the meaning given in Section 2.2.1.

"Agreement" means this Land Disposition Agreement.

"Agreement Date" means the date first written above, which shall be the date on which the City Council and Redevelopment Agency board approve this Agreement.

"BCDC" means the Bay Conservation and Development Commission.

"CEQA" means the California Environmental Quality Act and any implementing regulations.

"City" means the City of Richmond, a charter city.

"City's Parties" shall mean the City, and its respective board members, council members, managers, directors, officers, employees, representatives, agents, shareholders, affiliated attorneys and related entities, successors and assigns.

"Close of Escrow" shall have the meaning given in Section 4.1.

"Closing Date" shall have the meaning given in Section 4.5

"Commencement Date" has the meaning given in Section 5.1.

"Completion Date" has the meaning given in Section 5.3.

"Consistent with Minimum Project Expectations" means a Project which is, in the reasonable judgment of the Developer, consistent in all material aspects with the characteristics described in the Minimum Project Expectations section of the Scope of Development, attached as Exhibit C.

"County" shall mean Contra Costa County, California.

"Deposits" or "Deposit" shall have the meaning given in Section 2.2.1.

"Developer" means Toll Bros., Inc., a Pennsylvania corporation.

"Document Schedule" has the meaning given in Section 6.1.2.

"EBRPD" mean East Bay Regional Park District.

"Entitlements" shall have the meaning given in Section 3.8.1.

"ERNA" shall have the meaning given in Recital H.

"Escrow" shall have the meaning given in Section 4.1.

"Escrow Agreement" shall mean the Agreement that may be entered into among the Redevelopment Agency, the City and Developer upon Close of Escrow pursuant to Section 3.6.

"Escrow Holder" shall have the meaning given in Section 4.1.

"Grant Deed" shall have the meaning given in Section 4.1.

"Hazardous Substances" shall mean any toxic or hazardous wastes, asbestos, PCBs, petroleum products and byproducts, substances defined or listed as "hazardous substances" or "toxic substances" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq., hazardous materials identified in or pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. §1802, et seq., hazardous wastes identified in or pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § §2601 et seq., any "toxic pollutant" under the Clean Water Act, 33 U.S.C. §466 et seq., as amended, any hazardous air pollutant under the Clean Air Act, 42 U.S.C. §7401 et seq., and any substance or pollutant which is present at, on or under the Property in a form and quantity which is regulated under any applicable state law concerning air quality or water quality.

"Initial Deposit" shall have the meaning given in Section 2.2.1(b).

"Memorandum" shall have the meaning given in Section 2.2.1(b).

"Monetary Liens" shall have the meaning given in Section 3.1.3.

"Mortgage" has the meaning given in Section 9.

"Mortgaged Property" has the meaning given in Section 9.

"Mortgagee" has the meaning given in Section 9.

"Official Records" shall have the meaning given in Section 4.1.

"Offsite Improvements" shall have the meaning given in Section 5.4.

"Option" has the meaning given in Section 8.3.

"Other Agency Approvals" shall have the meaning given in Section 3.8.5.

"Outside Closing Date" shall have the meaning given in Section 4.5.

"Park Property" shall have the meaning given in Recital G.

"Permitted Delay" has the meaning given in Section 10.6.

"Permitted Exceptions" shall have the meaning given in Section 3.1.2.

"Planning Documents" shall have the meaning given in Section 8.4.

"Project" shall have the meaning given in Recital I.

"Project Applications" has the meaning given in Section 3.8.1.

"Project Area" means the redevelopment project area covered by the Redevelopment Plan.

"Property" shall mean the Terminal One property comprised of the Park Property and the Residential Property.

"Proposal" shall have the meaning given in Recital G.

"Proforma" shall have the meaning given in Section 3.1.1.

"Purchase Price" shall have the meaning given in Section 2.2.

"Quimby Act" has the meaning given in Section 5.4.2.

"RAP" means the Remedial Action Plan for the Property approved by the RWQCB, the City and the Redevelopment Agency after collaborative input from Developer.

"Redevelopment Agency" means the Richmond Redevelopment Agency, a public body corporate and politic.

"Redevelopment Agency Demolition" shall have the meaning given in Recital F.

"Redevelopment Agency Remediation" shall have the meaning given in Recital F.

"Redevelopment Agency's Parties" shall mean the Redevelopment Agency, and its respective board members, council members, managers, directors, officers,

employees, representatives, agents, shareholders, affiliated attorneys and related entities, successors and assigns.

"Redevelopment Plan" means the Amended and Restated Redevelopment Plan for Project Area No. 11-A (Harbour), as amended from time to time.

"Residential Property" shall be: (a) the real property generally described in Recital G; and (b) the land in the portion of Dornan Drive, if vacated pursuant to Section 3.4.

"RFP" shall have the meaning given in Recital G.

"RWQCB" shall mean the San Francisco Bay Regional Water Quality Control Board.

"Schedule of Performance" shall mean the schedule of actions to be completed by the parties pursuant to this Agreement, attached as Exhibit D.

"SLC" means State Lands Commission.

"Title Company" shall have the meaning given in Section 3.1.1.

"Title Policy" shall have the meaning given in Section 3.2.

"To the best of the City's knowledge" shall have the meaning given in Section 6.1.5.

"Trust" shall have the meaning given in Section 3.7.

2.    PURCHASE AND SALE.

    2.1    Agreement to Buy and Sell.  Subject to the terms and conditions set forth herein, City agrees to sell and convey to Developer, and Developer hereby agrees to acquire and purchase from City, the Residential Property.  As used herein, the term "Residential Property" shall include the Residential Property and all of City's right, title and interest in and to all appurtenant easements, rights of way, permits, entitlements, assignments of any utility agreement, connections for water and sewer, and engineering plans, if any.

    2.2    Purchase Price.  The purchase price for the Residential Property shall be Thirteen Million Dollars ($13,000,000.00) (the "Purchase Price").  The Purchase Price (including the components thereof) is payable as follows:

        2.2.1    Deposits.

            (a)    Pursuant to the ERNA, Developer has previously deposited with City the total sum of One Hundred Thousand Dollars ($100,000.00) (the

"Initial Deposit"). The Initial Deposit is non-refundable. All Initial Deposit monies, and any interest thereon shall be applied to the Purchase Price, or retained by the City if this Agreement is terminated prior to Close of Escrow.

(b)     In addition to the Initial Deposit described above, on the later of: (i) the date (A) one hundred thirty (130) days after the City's approval of this Agreement without a challenge or appeal, or (B) five (5) days after any challenge or appeal has been resolved in a manner acceptable to Developer and City in their reasonable discretion, or (ii) five business days after the date for City's agreement or refusal to remove title exceptions in accordance with Section 3.1.2, the Developer shall make an additional deposit, non-refundable in accordance with the provisions of Section 4.8.1, into Escrow of One Million Dollars ($1,000,000.00) (the "Additional Deposit") which shall be credited towards the purchase of the Residential Property upon Close of Escrow. At the time the Additional Deposit is placed in escrow, the City and Developer shall execute, acknowledge and deliver to the Title Company for immediate recordation, a memorandum of this Agreement in the form attached as Exhibit E (the "Memorandum").

(c)     As used herein, the term "Deposits" shall include any interest earned thereon and shall refer to the Initial Deposit and the Additional Deposit made by Developer pursuant to this Agreement. The Deposits, whether held by City or by the Escrow Holder, shall be invested in an interest-bearing account as City may designate, with the interest thereon to accrue and become a part of the Deposits.

2.2.2  Purchase Price. The remainder of the Purchase Price plus any amounts owed by Developer for closing costs less the amount of the Deposits shall be deposited by the Developer with the Escrow Agent in cash one day prior to the Close of Escrow.

2.3     Access. From and after the Agreement Date through the Close of Escrow and provided the Developer has in full force and effect, and has delivered to the City certificates of coverage for, all insurances policies as set forth in the attached Exhibit H, Developer, its agents, employees and contractors shall have the right to enter the Property for the purposes of conducting such investigations, inspections and tests of the Property as Developer deems necessary; provided, however, that Developer shall not conduct any investigation, inspection or test on the Property during the time the Redevelopment Agency is conducting actual Redevelopment Agency Remediation on the Property in accordance with Section 3.5 without prior written notice to City of the investigation, inspection or test to be conducted, and City's approval thereof, which approval shall not be unreasonably withheld or delayed. With respect to the required approval during Redevelopment Agency Remediation, City shall be deemed to have approved Developer's or its consultants access for any investigation, inspection or test identified in any such written notice during the ten (10) business days after City's receipt of the notice unless City has notified Developer in writing of City's disapproval of the same on or before the end of the tenth business day. Developer hereby agrees to indemnify and hold City and Redevelopment Agency harmless from and against any and all loss, expense, claim, damage and injury to person or property resulting from the

acts or omissions of Developer, its employees, consultants, engineers, authorized agents and contractors on Property in connection with the performance of any investigation of the Property as contemplated herein provided, however, that this indemnity shall not apply to impacts on the value of the Property arising from conditions discovered by Developer's testing, inspection or investigation. In accordance with Section 3.8.4, the Developer shall provide to City, promptly after Developer's receipt thereof, a copy of all written reports or other documents relating to the results of any investigation, inspection or test of the Property.

     3.    ACTIONS PENDING CLOSE OF ESCROW.

        3.1    <u>Title Review</u>.

          3.1.1    <u>Proforma</u>.  Chicago Title Company (the "Title Company") will be providing the parties with a Pro-Forma Title Policy for the Property as described on <u>Exhibit A</u>, as a part of Order No. 9234451-SDC, together with legible copies of all documents referenced therein as exceptions to title and a plot plan for the Residential Property showing all the locations of all recorded easements (collectively, the "Proforma").

          3.1.2    <u>Review Period</u>.  Developer shall have sixty (60) days after receipt to review the Proforma and any documents referred to in the Proforma and to give City written notice of any objections to title.  Within sixty (60) days following its receipt of Developer's notice, City shall advise Developer in writing whether it will remove or cause the Title Company to endorse over the exceptions not approved by Developer.  If City fails to so notify Developer, City shall be deemed to have refused to remove the exceptions other than Monetary Liens.  If City refuses to remove any exception, Developer, at its election, by written notice to City within sixty (60) days following the City's notice or deemed disapproval, may terminate this Agreement in accordance with Section 4.8.3.  If Developer elects to proceed with the purchase, Developer shall be deemed to have accepted title subject only to those exceptions described in the Proforma which are not: i) Monetary Liens and ii) items disapproved by Developer and agreed to be removed by City ("Permitted Exceptions").

          3.1.3    <u>Monetary Liens</u>.  At its expense, City shall remove at or before Closing all monetary liens (collectively, "Monetary Liens"), including, without limitation:  (i) all delinquent taxes or bonds, but not assessments, which shall be subject to review under Section 3.1.2, including interest and penalties; and (ii) all other monetary liens, whether or not shown on the Proforma provided the City has notice of any monetary liens not shown on the Proforma (including judgment and mechanics' liens, whether or not liquidated, and mortgages and deeds of trust, with City being fully responsible for any fees or penalties).  Monetary Liens shall not include a lien for non-delinquent general and supplemental real property taxes.

          3.1.4    <u>Additional Exceptions</u>.  Any additional exceptions to title beyond the Permitted Exceptions (other than exceptions caused by Developer or required or requested by Developer in connection with approval of the Project) shown

on any supplement to the Proforma that may be issued from time to time by the Title Company must be removed by City at or prior to the Close of Escrow, or City shall cause the Title Company to endorse over such exceptions at the Close of Escrow, in a manner satisfactory to Developer in its reasonable discretion, unless such exceptions are expressly approved by Developer in writing (in which case the approved exceptions shall thereafter constitute Permitted Exceptions).

   3.1.5 <u>Leases, Possession</u>. Prior to the Close of Escrow, the City shall terminate all leases and shall deliver possession of the Residential Property at Closing free of the rights of any tenant or other person claiming any interest in or rights to occupy the Residential Property and shall cause the Red Oak Victory Ship currently moored at the pier on the Property to be permanently moved with no right to return to the Property and no extended mooring rights for the pier on the Park Property will be granted. City shall be solely responsible for any obligations regarding relocation of any tenants and the provision of replacement premises which shall be conducted at no cost to Developer.

   3.2 <u>Title Policy</u>. Developer's obligation to proceed to the Close of Escrow shall be conditioned upon the commitment by Title Company to issue an ALTA Owner's Policy of Title Insurance with full extended coverage showing fee title to the Residential Property vested in Developer with liability equal to the Purchase Price, subject only to the Permitted Exceptions (the "Title Policy").

   3.3 <u>Legal Parcel</u>. The Developer, at its own cost, shall survey the Property, and take all necessary steps to apply to the City for a Certificate of Compliance regarding the establishment of the Residential Property as a separate legal parcel as part of the Entitlement process, after the Redevelopment Agency informs the Developer in writing that Redevelopment Agency has secured the financing required in Section 3.5.4 but prior to or at the Close of Escrow. The City agrees to cooperate with such efforts as the seller of the Residential Property, but reserves sole, complete, absolute and unfettered discretion as a regulatory body in any such applications.

   3.4 <u>Street Vacations/Closures</u>. The Developer shall cause to be prepared, at Developer's cost, all engineering reports, drawings and other documents necessary to apply to the City for the City's vacation or closure of Dornan Drive between Brickyard Cove Road and the terminus of Dornan Drive, as part of the Project Applications no later than the date set forth for submission of the Project Applications in Section 3.8.2. The Developer shall cause a civil engineer, approved by City and at Developer's cost, to survey and determine the exact square footage of the portion of Dornan Drive that may be vacated by the City. The Developer and the Redevelopment Agency shall cooperate in obtaining the City's approval of the street vacations/closures for that portion of Dornan Drive as part of the process of the Entitlement process. The City, as a regulatory body, shall retain sole, complete, absolute and unfettered discretion to approve or disapprove such vacation/closure. If vacated by the City, these street vacations/closures shall be subject to any necessary reservations or easements for emergency access, public rights of access for the Park Property, utilities and any other item deemed necessary by the City. If vacated by the City, the documents

implementing the street vacations or closures, if any, shall be recorded at the Close of Escrow. If vacated by the City, this vacated street area shall be included in the Residential Property to be conveyed at Close of Escrow, or later date. Failure to vacate any portion of Dornan Drive will not change the purchase price for the Residential Property under this Agreement.

    3.5    Redevelopment Agency Remediation.

        3.5.1    Remediation Work. Subject to (a) the certification or adoption of appropriate CEQA documentation regarding the Redevelopment Agency Remediation, and the Redevelopment Agency's approval of such documentation, as a responsible party, in the Redevelopment Agency's sole, complete, absolute and unfettered discretion, (b) provided Redevelopment Agency has taken all good faith efforts to apply, the Redevelopment Agency, obtaining all governmental and regulatory agency permits and approvals for the Redevelopment Agency Remediation and the expiration of all applicable administrative and judicial appeal and the later of to occur of: i) the expiration of the CEQA statute of limitations or ii) the date ninety (90) days after the approval, without appeal or challenge, or any appeal or challenge has been resolved in a manner acceptable to Redevelopment Agency in Redevelopment Agency's reasonable discretion, and (c) the Redevelopment Agency's ability to obtain financing for the Redevelopment Agency Remediation of the Property pursuant to the RAP, the Redevelopment Agency shall, at the Redevelopment Agency's sole cost (as between the Redevelopment Agency and the Developer and not as between the Redevelopment Agency and any third party(ies)), complete or cause the completion of such investigation, response, and Redevelopment Agency Remediation activities with respect to Hazardous Substances in, on, under, about or emanating from the Property as may be required by the RWQCB, or any other governmental agency with jurisdiction to protect human health and the environment, in order to render (1) the Residential Property suitable for residential development consistent with the existing General Plan designation and all applicable health and safety requirements and (2) the Park Property suitable for park and recreational uses consistent with the existing General Plan designation and all applicable health and safety requirements and suitable for residential use on the adjacent Residential Property. The Redevelopment Agency will take these actions to render the Residential Property suitable for residential development consistent with the existing General Plan designations and all applicable health and safety requirements, independently of its obligations under this Agreement, to maintain flexibility for the future redevelopment of the Property, whether under this Agreement or other reuse scenarios.

        3.5.2    Insurance. The parties agree to explore the cost effectiveness of jointly purchasing environmental insurance for third party liability claims made against one or more of the parties and the appropriate shares of that policy cost.

        3.5.3    Polanco Act. The Redevelopment Agency agrees to use its best efforts to secure immunity from Hazardous Substances releases remediated pursuant to the RAP as provided in the Polanco Act (California Health and Safety Code Section 33459 et seq.) .

733\12\172152.9                              10

3.5.4  <u>Financing</u>. The Redevelopment Agency shall use its best efforts to secure sufficient financing for the Redevelopment Agency Remediation to be conducted pursuant to Section 3.5.1. The Agency shall provide a written notice to Developer notifying Developer as soon as the Redevelopment Agency secures such financing or of the Redevelopment Agency's inability to secure such financing no later than February 1, 2004. Failure to secure sufficient financing for the Redevelopment Agency Remediation by February 1, 2004 shall extend all other time frames to perform by any party to this Agreement, including but not limited to the Additional Deposit and the Outside Closing Date as set forth in Sections 2.2.1 and 4.5, respectively, by the same time period as the time period from February 1, 2004 to the date Redevelopment Agency secures sufficient financing for the Redevelopment Agency Remediation. If the Redevelopment Agency cannot secure sufficient financing for the Redevelopment Agency Remediation by December 31, 2004, either party can terminate this Agreement upon thirty (30) days written notice to the other parties, and no party shall have any rights or remedies against any other party, however, the City shall be entitled to retain the Initial Deposit and any interest earned thereon, the City shall be entitled to the Planning Documents pursuant to Section 8.4, and Developer shall be entitled to the return of the Additional Deposit, if any, and any interest earned thereon.

3.6  <u>Demolition of Warehouse on Park Property</u>. Subject to the City's certification or adoption of appropriate CEQA documentation, if necessary, in the City's sole, complete, unfettered and absolute discretion, the Redevelopment Agency, at its sole cost, shall obtain any required approvals under local, state and federal regulations governing the Redevelopment Agency Demolition. Actual demolition need not be completed prior to the Close of Escrow, provided the Redevelopment Agency has obtained any necessary approvals for the Redevelopment Agency Demolition prior to Close of Escrow. Actual demolition will occur only after the Redevelopment Agency has obtained all governmental and regulatory agency permits and approvals, if any, for the Redevelopment Agency Demolition and the expiration of all applicable administrative and judicial appeal and challenge periods for administrative or judicial challenge to such entitlements without appeal or challenge, or any appeal or challenge has been resolved in a manner acceptable to Redevelopment Agency in Redevelopment Agency's reasonable discretion. If the Redevelopment Agency Demolition is not completed prior to the Close of Escrow, the City and Redevelopment Agency shall enter into an Escrow Agreement with Developer at the Closing reasonably satisfactory to all parties which will require the set aside from the Purchase Price at Closing of one hundred ten percent (110%) of the estimated remaining cost of the Redevelopment Agency Demolition, which shall be security for the Redevelopment Agency's obligation to complete the Redevelopment Agency Demolition.

3.7  <u>State Lands</u>. The Parties recognize that a portion of the Property may be encumbered by the public trust for commerce, navigation and fisheries ("Trust"), and that it is in their mutual interest to work with the State Lands Commission to establish the boundary of any lands subject to the Trust, and, if necessary, to undertake actions necessary to remove any Trust-related clouds on title to the Residential Property. Accordingly, prior to the Close of Escrow, the City, at its sole cost, shall take

all necessary actions, consistent with its obligations as trustee of lands subject to the Trust, to process with the State Lands Commission any development plans for the Project and the Park Property, and to obtain any necessary approval, clearance, boundary line agreement, or Trust exchange from the State Lands Commission for the Project such that the City may convey clear title to the Residential Property to Developer. The Developer shall cooperate in such efforts and shall be granted the right to review and comment on the preparation of any applicable applications to the State Lands Commission.

   3.8  Entitlement Process.

     3.8.1 Commencement of Formal Processing.  Developer shall pursue and the Redevelopment Agency shall help facilitate and cooperate with Developer, as is within its reasonable authority, in obtaining all necessary local entitlements which may include, but not be limited to, approval by the City Council, Planning Commission, Design Review organization or other local agency with discretionary approval authority, as appropriate, of the entitlements for a Project and Offsite Improvements Consistent with Minimum Project Expectations (the "Entitlements") (which may include but are not limited to planned area development zoning, development plans, a Conditional Use Permit, design review or other discretionary approvals, a development agreement, a vesting subdivision map and, if necessary, a general plan amendment to be Consistent with Minimum Project Expectations). Nothing in this Agreement shall be deemed to require City to approve the Entitlements or any entitlements whatsoever or otherwise commit its discretionary powers in any particular manner. Following execution of this Agreement, the Developer intends to file applications with the City for all discretionary City approvals ("Project Applications") to obtain the Entitlements.  City agrees to sign as co-applicant, if required, for any Project Applications for Entitlements applicable to City-owned property. The parties anticipate that formal review and processing of the Project Applications shall commence promptly following approval and execution of this Agreement and shall proceed expeditiously pursuant to the Schedule of Performance. Developer shall pay the reasonable cost of an additional mutually acceptable person to assist the City in meeting its obligations under the Schedule of Performance, subject to Developer's right to reasonably approve the cost and the terms of the contract.

     3.8.2 Project Application Timing.  The Project Applications shall be ★ filed with the City no later than sixty (60) days following the date the Redevelopment Agency informs the Developer that it has secured sufficient financing for the Redevelopment Agency Remediation pursuant to Section 3.5.4. If the Developer proposes to develop more than 242 dwelling units and that number of units may require Developer to apply for a general plan amendment, the application for the general plan amendment shall be filed with the other Project Applications. In addition, Developer shall file an application for a grading and demolition permits for the Project at a time such that it normally could be processed and issued contemporaneously with the Close of Escrow.

3.8.3  CEQA Review.  Following execution of this Agreement, the City shall reasonable efforts to diligently complete any required environmental review of the Project, the Offsite Improvements, and the Entitlements in accordance with CEQA and the time frames set forth in the Schedule of Performance.  The Developer agrees to pay the costs of the CEQA review and shall have reasonable review and approval of the cost and the terms of the contract with the City's CEQA consultant.  The Developer acknowledges that the environmental review process under CEQA will involve preparation and consideration of additional information as well as consideration of input from interested organizations and individuals; that approval or disapproval of the Project following completion of the environmental review process is within the sole, complete, unfettered and absolute discretion of the City without limitation by or consideration of the terms of this Agreement; and that the City makes no representation regarding the ability or willingness of the City to approve development of the Project at the conclusion of the environmental review process required by CEQA, or regarding the imposition of any mitigation measures as conditions of any approval that may be imposed on the Project.  In addition, the Developer acknowledges that any required approvals by any other local, state or federal agency may require additional environmental review, and that any approval by the City shall not bind any other local, state or federal agency to approve the Project or to impose mitigation measures which are consistent with the terms of this Agreement or with the terms of any mitigation measures required by the City pursuant to the City's environmental review.

3.8.4  Technical Studies.  Developer shall provide copies to City of any technical studies or analyses Developer determines to conduct on the Residential Property related to the development of the Project, including without limitation soils/geology and hydrology investigations, visual analyses, or biological or cultural resource assessments.

3.8.5  Other Agency Approvals.  The parties understand that the Project may require certain State and Federal approvals prior to commencement of development of the Residential Property ("Other Agency Approvals").  These Other Agency Approvals may include without limitation approvals from the BCDC, SLC, California State Historic Preservation Office, California Department of Fish and Game, RWQCB, U.S. Army Corps of Engineers, United States Coast Guard, U.S. Fish & Wildlife Service, and National Marine Fisheries Service.  The Redevelopment Agency, not Developer, shall be responsible for obtaining the SLC approvals as set forth in Section 3.7 of this Agreement and any Other Agency Approvals required for the Redevelopment Agency Remediation.  The Developer, not the City or Redevelopment Agency, shall be responsible for obtaining any Other Agency Approvals for the Project and the Offsite Improvements.  The Developer shall apply for any Other Agency Approvals in sufficient and abundant time as to not delay Close of Escrow.

3.8.6  Mitigation Measures.  If the City approves the development of the Project following completion of the environmental review process and such approval is conditioned upon implementation of specified environmental mitigation measures, then the Developer shall be responsible at its sole cost for implementing such mitigation measures and any mitigations measures required in any Other Agency

Approvals as part of the development of the Project. City or Redevelopment Agency, as may be appropriate, at the respective entity's cost, shall be responsible for implementing all mitigation measures or other applicable requirements for the Redevelopment Agency Remediation and Redevelopment Agency Demolition.

      3.8.7  Financing Capacity. Immediately prior to Close of Escrow, Developer shall deliver to City its most recent audited financial statements and a certificate signed by the Developer's chief financial officer stating that the Developer's financial position has not changed from the date of the applicable financial statements in such a manner as would materially and adversely affect its ability to perform its obligations under this Agreement.

    4.     ESCROW AND CLOSE OF ESCROW.

      4.1    Opening of Escrow. Developer has opened an escrow (the "Escrow") with Chicago Title Insurance Company (including its successors as escrow agent, if any, the "Escrow Holder") in its office currently located 1646 N. California Blvd., Walnut Creek, CA.  For sales of the residential units to homebuyers, the Developer agrees to use the Richmond office of a title company acceptable to Developer. Within three (3) business days after the date when this Agreement is fully executed, Developer shall deposit with Escrow Holder a copy of the fully executed Agreement, or executed counterparts hereof.  As used in this Agreement, the "Close of Escrow" shall mean the date a Grant Deed in the form of Exhibit F attached hereto ("Grant Deed") conveying the Residential Property to Developer is recorded in the Office of the Recorder of the County (the "Official Records").

      4.2    Escrow Fees and Other Charges. In connection with the Close of Escrow, Developer shall pay (a) the premium cost of the Title Policy, including the cost of any endorsements required by Developer, (b) recording charges, (c) one-half (1/2) of Escrow Holder's fees, and (d) all County and City transfer taxes and fees. In connection with the Close of Escrow, City shall pay one-half (1/2) of Escrow Holder's fees. All other costs related to the transaction shall be paid by the parties in the manner consistent with common practice in residential land transactions in the County.

      4.3    Developer's Conditions to Close of Escrow. Developer's obligations to close Escrow and purchase the Residential Property are conditioned upon the satisfaction or waiver of the following conditions:

      4.3.1   Legal Parcel. The creation of the Residential Property as a legal parcel prior to or at Close of Escrow in accordance with Section 3.3 provided that Developer has taken all good faith efforts to apply for the creation of such legal parcel at the times required by this Agreement.

      4.3.2   Redevelopment Agency Remediation. Completion by the Redevelopment Agency of the  Redevelopment Agency Remediation in accordance with Section 3.5.1 as evidenced by the delivery of written confirmation by the RWQCB that no further action, other than certain construction practices, monitoring and reporting

(which construction practices, monitoring and reporting shall be addressed by the Redevelopment Agency at its own continuing expense), and/or use restrictions is required by the RWQCB (1) to render the Residential Property suitable for residential development, (2) to render the Park Property suitable for park development, and (3) to prevent residual Hazardous Substances at the Property from posing a human health risk to residential occupants or park users, or an ecological risk, that is unacceptable to the RWQCB. In addition to the other conditions of this Section 4.3.2, the RWQCB shall have given its final approval, in writing, to any proposed construction practices (including worker safety practices), monitoring and reporting requirements and use restrictions for the Property and, in the reasonable judgment of Developer, those construction practices, monitoring and reporting requirements and use restrictions will not materially and adversely affect the development of the Project. Developer will provide written notice to the City of Developer's approval or disapproval of the RWQCB-approved construction practices, monitoring and reporting requirements and use restrictions within thirty (30) days after the Redevelopment Agency or City provides the Developer written notice of the RWQCB-approved construction practices, monitoring and reporting requirements and use restrictions.

  4.3.3  <u>Warehouse Demolition</u>. The requirements of Section 3.6 have been met other than the conditions specifically described as not pre-closing conditions.

  4.3.4  <u>Entitlements</u>. Provided Developer has taken all good faith efforts to apply for the Entitlements at the times required by this Agreement, Developer shall have received all Entitlements for a project Consistent with Minimum Project Expectations and the later of to occur of: i) the expiration of the CEQA statute of limitations for the Entitlements or ii) the date (A) ninety (90) days after approval of the Entitlements, without a challenge or appeal, or (B) five (5) days after any challenge or appeal has been resolved in a manner acceptable to Developer in Developer's reasonable discretion. Vacation of Dornan Drive, a development agreement or the approval of a general plan amendment shall not be conditions to the close of escrow, unless the vacation or general plan amendment is required to obtain Entitlements for a project Consistent with Minimum Project Expectations.

  4.3.5  <u>Other Agency Approvals</u>. Provided Developer has taken all good faith efforts to apply for the Other Agency Approvals for the Project, Developer shall have received all Other Agency Approvals and Redevelopment Agency shall have obtained SLC approval for the Project and ninety (90) days have passed since the latest such approval to occur without a challenge or appeal, or any challenge or appeal has been resolved in a manner acceptable to Developer in Developer's reasonable discretion.

  4.3.6  <u>No Default.</u> The representations and warranties of the City and Redevelopment Agency shall be true in all material aspects and neither the City nor the Redevelopment Agency shall be in default of their obligations under this Agreement.

4.4    <u>City's Conditions to Close of Escrow</u>.  City's obligations to close escrow and sell, transfer and convey the Residential Property are conditioned upon the satisfaction or waiver of the following conditions:

4.4.1    <u>Financial Ability.</u>  Developer shall have complied with the requirements in Section 3.8.7.

4.4.2    <u>No Default.</u>  The representations and warranties of the Developer shall be true in all material aspects and the Developer shall not be in default of its obligations under this Agreement.

4.5    <u>Closing Date</u>.  The Close of Escrow shall occur sixty (60) days following the satisfaction or waiver of all conditions to Closing contained in Sections 4.3 and 4.4 ("Closing Date") but in no event later than June 29, 2005, subject to extensions for Permitted Delays pursuant to Section 10.6 ("Outside Closing Date").   Subject to the foregoing limitations, Developer shall designate the Closing Date in written notice to City and Escrow Holder delivered not later than fifteen (15) days prior to the designated Closing Date.

4.6    <u>Close of Escrow Documents</u>.  The parties shall deposit the following with Escrow Holder prior to the Close of Escrow:

4.6.1    <u>Developer's Deliveries</u>.  Developer shall deposit with Escrow Holder:

(a)    Developer's share of Close of Escrow costs and prorations as provided in Sections 4.2 and 4.7.2 and the amount of the Purchase Price less the amount of the Deposits; and

(b)    counterparts of the Escrow Agreement duly executed by Developer, if required under Section 3.6.

4.6.2    <u>City's Deliveries</u>.  City shall deposit with Escrow Holder:

(a)    the Grant Deed conveying fee title to the Residential Property, subject only to the Permitted Exceptions; and

(b)    counterparts of the Escrow Agreement duly executed by City, if required under Section 3.6.

4.6.3    <u>Additional Instruments</u>.  City and Developer shall each deposit such other escrow instructions and/or instruments as are reasonably required by Escrow Holder or otherwise required to proceed to the Close of Escrow and consummate the sale of the Residential Property in accordance with the terms of this Agreement.

4.7    <u>Close of Escrow</u>.

4.7.1    <u>Actions by Escrow Holder</u>.  On the Closing Date, provided all of the conditions to the parties' obligations have been satisfied or waived, Escrow Holder shall undertake and perform the following acts in the following order:

(a)    record the Grant Deed and the Memorandum in the Official Records (with documentary transfer tax information to be affixed after recording) and obtain a conformed copies thereof for delivery to Developer and City;

(b)    pay any transfer taxes;

(c)    instruct the County Recorder to return the Grant Deed to Developer;

(d)    deliver to Developer (i) a conformed copy of the recorded Grant Deed, (ii) the Title Policy covering the Residential Property subject only to the Permitted Exceptions, (iii) a conformed copy of each other document recorded in connection with the Close of Escrow, and (iv) an original of each unrecorded document received by Escrow Holder hereunder.

(e)    Deliver to City (i) a conformed copy of the recorded Grant Deed, (ii) a copy of the Title Policy covering the Residential Property subject only to the Permitted Exceptions, (iii) a conformed copy of each other document recorded in connection with the Close of Escrow, (iv) an original of each unrecorded document received by Escrow Holder hereunder, and (v) the Purchase Price less the amount of the Deposits and less the amount of the City's share of closing costs and prorations set forth in Sections 4.2 and 4.7.2.

4.7.2    <u>Prorations</u>.  Real property taxes and assessments for the Residential Property shall be prorated as of the Close of Escrow on the basis of the most recent tax information. Said prorations shall be based on a thirty (30) day month. City's portion of such taxes and assessments which are Permitted Exceptions, if any, may be paid using the proceeds of the Close of Escrow or by the appropriate reduction in the Purchase Price in the Close of Escrow.

4.7.3    <u>Possession</u>.  Upon the Close of Escrow, exclusive possession of and title to the Residential Property shall be conveyed to the Developer, subject only to the Permitted Exceptions.

4.8    <u>Failure to Close; Termination</u>.

4.8.1    <u>Default</u>.  Upon an event of default the non-defaulting party shall give written notice of a default to the defaulting Party, specifying the nature of the default and the required action to cure the default.  If a default remains uncured thirty (30) days after receipt by the defaulting party of such notice, the non-defaulting party may terminate this Agreement and exercise any rights and remedies available at law or

equity, including but not limited to seeking damages or specific performance provided however if Redevelopment Agency is not able to secure approvals of other agencies for the Redevelopment Agency Remediation pursuant to Section 3.5.1 or the Redevelopment Agency Demolition pursuant to Section 3.6, the parties' only remedies for those events are the remedies set forth in Section 4.8.3. Upon a default by City and/or Redevelopment Agency, Developer shall have no right to recover the Initial Deposit and interest thereon. Upon a default by Developer, City shall be entitled to retain the Initial Deposit and Escrow Holder shall pay the Additional Deposit, if any, and interest thereon to City, the City shall be entitled to the Planning Documents pursuant to Section 8.4.

      4.8.2  <u>Outside Closing Date</u>. If Close of Escrow has not occurred by the Outside Closing Date, provided neither Developer nor City is in default under this Agreement, then upon Escrow Holder's receipt of written notice of the termination of the Agreement from either City or Developer (a) this Agreement and Escrow shall terminate; (b) the City shall retain the Initial Deposit and interest thereon; (c) the Escrow Holder shall return the Additional Deposit, if any, plus interest thereon to Developer; and (d) the City shall be entitled to the Planning Documents pursuant to Section 8.4.

      4.8.3  <u>Failure of Condition</u>. In the event either party terminates this Agreement for failure of condition in accordance with the terms of this Agreement, then, provided neither party is in default under this Agreement, upon Escrow Holder's receipt of written notice of such termination of this Agreement from either party (a) this Agreement and the Escrow shall terminate, (b) if the Developer terminated this Agreement as a result of a failure of the conditions in Section 4.3, then, if made, the Additional Deposit and interest thereon shall be returned to Developer; (c) City shall retain the Initial Deposit and interest thereon; (d) the City shall be entitled to the Planning Documents pursuant to Section 8.4; (e) Developer and City shall share equally any escrow and title cancellation charges, and (f) the parties shall have no further right, remedy or obligation under this Agreement, except as otherwise expressly provided herein.

      4.8.4  <u>Cancellation Charges</u>. In the event the failure to close is due to the default of one of the parties, the defaulting party shall bear the sole and full liability for paying any escrow and title cancellation fees and charges. Otherwise, each party shall pay fifty percent (50%) of such fees and charges.

      4.9     <u>Physical Condition of Residential Property</u>.

      4.9.1  <u>Limited Representations By City and Redevelopment Agency</u>. Developer acknowledges that, except for any representations expressly made by City and Redevelopment Agency in this Agreement, City's Parties and Redevelopment Agency's Parties have made no representations or warranties by or on behalf of City or Redevelopment Agency as to any matters concerning the Residential Property, the condition of the Residential Property, the size of the Residential Property, the condition of the improvements on the Residential Property, the present use of the Residential Property or the suitability of Developer's intended use of the Residential

Property, including without limitation, the suitability of the topography, the compliance of the improvements with any codes, the availability of water rights or utilities, any natural hazard of any kind or nature including without limitation, flood hazard, earthquake fault or seismic hazard, or fire risk or hazard, the present and future zoning, subdivision and any and all other land use matters; the condition of the soil, subsoil or groundwater of the Residential Property and any and all potential flooding or flooding, or access to public roads, except as set forth in the reports in the attached <u>Exhibit G</u>(the Document Schedule).

4.9.2  <u>"AS IS"</u>.  Subject to compliance with the requirements of Sections 3.5 and 3.6, Developer acknowledges, agrees and represents that the Residential Property is to be purchased, conveyed and accepted by Developer "AS IS," "WHERE IS" AND WITH ALL FAULTS.

4.9.3  <u>Developer's Independent Review</u>.  Developer represents and warrants to City and Redevelopment Agency that, as of the Agreement Date, Developer shall have performed an independent inspection and investigation of the Residential Property  and the Park Property and shall have investigated operative governmental laws and regulations, including without limitation, land use laws and regulations to which the Residential Property and Park Property may be subject for its existing use or for Developer's intended use, and Developer further represents that it shall acquire the Residential Property on the basis of its independent inspection and investigation of the Residential Property and the Park Property, including, without limitation, Developer's review and determination of the applicability and effect of such laws and regulations, and on the confirmation issued by RWQCB as set forth in Section 4.3.2.  Developer has neither received nor relied on any representations concerning such laws and regulations from City's Parties or from Redevelopment Agency's Parties.

4.9.4  <u>Developer's Waiver</u>.  In the event Developer becomes aware of, prior to Close of Escrow, any event or condition, other than an intentional breach or willful misconduct on the part of the City or Redevelopment Agency, that would constitute a breach or default by City or Redevelopment Agency or a failure of any condition precedent to Developer's obligations hereunder, but Developer proceeds with the Close of Escrow notwithstanding such event or condition, then Developer shall be deemed to have waived and released any claim or cause of action arising there from, and City and Redevelopment Agency shall have no liability by reason of any such breach, default or condition.

4.9.5  <u>Survival</u>.  The provisions of this Section 4.9 shall survive the Close of Escrow and shall not be deemed merged into any instrument

5.     DEVELOPMENT OBLIGATIONS.

The following provisions shall apply if and only if the Closing occurs.  Nothing in this Agreement, including the following provisions, shall in any way limit the discretion of City in acting in its regulatory capacity regarding the Entitlements and related actions.

5.1    <u>Commencement of Construction</u>.  Subject to Permitted Delays pursuant to Section 10.6, the Developer shall commence construction of the Project by commencing the grading and demolition, if any, for the Project as soon as reasonably practical following Close of Escrow, but in no event later than 180 days after the later of (i) issuance of a grading and demolition permits or (ii) Close of Escrow, subject to Permitted Delays pursuant to Section 10.6 (the "Commencement Date").

5.2    <u>Building Permit</u>.  Developer shall obtain a building permit for its first phase of residential units for the Project as soon as reasonably practical following Close of Escrow, but in no event later than one (1) year after the Close of Escrow subject to Permitted Delays pursuant to Section 10.6.

5.3    <u>Completion of Construction</u>.  Developer shall complete construction of: (a) the Developer's first phase of residential units no later than one (1) year after the issuance of the building permits for such phase, subject to Permitted Delays pursuant to Section 10.6; and (b) the last phase of the Project as soon as feasible given the then-current market conditions (the "Completion Date").

5.4    <u>Offsite Construction Obligations</u>.  In addition to construction of the Project, Developer agrees to construct the following offsite improvements (collectively, "Offsite Improvements"):

5.4.1    <u>Brickyard Cove Road</u>.  Improvement of Brickyard Cove Road from Dornan Drive to Sea Cliff Estates in a manner Consistent with Minimum Project Expectations (which street standard is acknowledged to be higher than generally applicable in the City of Richmond), at Developer's sole cost, provided however that the City or Redevelopment Agency shall be responsible for the remediation of any Hazardous Substances discovered in the Brickyard Cove right of way required by law for such use and that, as a condition to Developer's obligation to improve Brickyard Cove Road between the guardhouse and Sea Cliff Estates, the City or the Redevelopment Agency shall first acquire fee title or a right of way to that portion of Brickyard Cove Road;

5.4.2    <u>Park.</u>  Installation of the park improvements Consistent with Minimum Project Expectations at Developer's cost.  The cost of Developer's installation and maintenance of the park shall be credited toward satisfaction of any Government Code Section 66477 et seq. ("Quimby Act") requirements which may apply to the Project as determined by the City.

5.4.3    <u>Pier</u>.  If Developer determines the pier is structurally sound and subject to obtaining any necessary Other Agency Approvals, Developer, at its cost, shall resurface the deck of the pier and provide related non-structural improvements to the pier.  If the Developer determines that the pier is not structurally sound, the Developer shall fence off the pier from remainder of the Park Property at its cost, subject to City approval.

5.4.4  <u>Redevelopment Agency Remediation Complete</u>. The City and the Redevelopment Agency will have completed the Redevelopment Agency Remediation pursuant to Section 3.5.1 as evidenced by the issuance of a no further action confirmation pursuant to Section 4.3.2 prior to installation of the Offsite Improvements.

5.4.5  <u>Cooperation</u>. The City and Redevelopment Agency shall cooperate with the Developer's efforts to complete all the above Offsite Improvements.

5.4.6  <u>Completion</u>. The Offsite Improvements, or any portion thereof, shall be deemed to be complete under this Agreement when finally accepted by the City, when finally accepted by another authority if another authority has jurisdiction over the work, and/or when finally accepted by a public utility if a public utility has jurisdiction over the work. The portion of the Offsite Improvements related to Section 5.4.1 shall be completed no later than the completion date for the first phase of residential units as set forth in Section 5.3(a). The portion of the Offsite Improvements related to Section 5.4.2 shall be completed no later than the date the certificate of occupancy is issued for the residential unit which represents 50% completion of all residential units in the Project.

5.5  <u>Affordable Housing</u>. Developer is under no obligation to construct affordable housing in the Project or to meet any Redevelopment Agency affordable housing obligations under the California Community Redevelopment Law.

5.6  <u>Equal Opportunity</u>. During the construction of the Project and Developer's Offsite Improvement work, there shall be no discrimination on the basis of race, color, creed, religion, sex, sexual orientation, marital status, ancestry or national origin in the hiring, firing, promoting or demoting of any person engaged in the construction work. The Developer and its contractors, employees and agents shall comply with all state laws, including all equal opportunity and fair employment law and regulations applicable to the Project and the Developer's Offsite Improvement work. Moreover, the Developer, by and through its construction contractor(s), shall give preference, to the extent practicable, for employment to those individuals residing within the geographical area governed by the Redevelopment Plan, as provided by relevant State law.

5.7  <u>Compliance with Richmond Municipal Code Chapter 2.56 and First Source Hiring</u>. The Developer agrees to comply with the City of Richmond's Local Employment Program Ordinance (Richmond Municipal Code Chapter 2.56), which is incorporated into this Agreement by this reference. The Developer shall also enter into a First Source Hiring Agreement with the City, substantially in the City's standard form for such agreement.

5.8  <u>Prevailing Wages</u>. The Developer shall and shall cause the contractor and subcontractors to pay prevailing wages and living wages for residential construction in the construction of the Project and the Offsite Improvements as those wages are determined pursuant to Labor Code Sections 1720 <u>et seq.</u> and implementing

regulations of the Department of Industrial Relations and the City of Richmond's Living Wage Ordinance (Richmond Municipal City Code Chapter 260). The Developer shall also comply with the other applicable provisions of Labor Code Sections 1720 et seq., implementing regulations of the Department of Industrial Relations and the Richmond Municipal Code Chapter 260. The Developer shall and shall cause the contractor and subcontractors to keep and retain such records as are necessary to determine if such prevailing wages have been paid as required pursuant to Labor Code Sections 1720 et seq. and implementing regulations of the Department of Industrial Relations  Copies of the currently applicable current per diem prevailing wages are available from the City of Richmond Public Works Department, Richmond, California. During the construction of the Project and the Offsite Improvements, Developer shall or shall cause the contractor to post at the Property the applicable prevailing rates of per diem wages. Developer shall indemnify, hold harmless and defend (with counsel reasonably acceptable to the Redevelopment Agency) the Redevelopment Agency and the City against any claim for claims, losses, liabilities, damages (direct or consequential), compensation, fines, penalties, causes of action, administrative and judicial proceedings and orders, judgments, enforcement actions of any kind, and all costs and expenses incurred therewith (including but not limited to attorneys' fees and costs) or other amounts arising out of the failure of the Developer, its contractor or its subcontractors to pay living wages pursuant to the Richmond Municipal Code and prevailing wages as determined pursuant to Labor Code Section 1720 et seq. and implementing regulations or comply with the other applicable provisions of Labor Code Sections 1720 et seq. and implementing regulations of the Department of Industrial Relations in connection with construction or any other work undertaken or in connection with the Property.

5.9    Compliance with Applicable Law. The Developer shall cause all work performed in connection with construction of the Project and the Offsite Improvements to be performed in compliance with (a) all applicable laws, ordinances, rules and regulations of federal, state, county or municipal governments or agencies now in force or that may be enacted hereafter which would be applicable to the Project absent this Agreement, and (b) all directions, rules and regulations of any fire marshal, health officer, building inspector, or other officer of every governmental agency now having or hereafter acquiring jurisdiction. The work shall proceed only after procurement of each permit, license, or other authorization that may be required by any governmental agency having jurisdiction, and the Developer shall be responsible for the procurement and maintenance thereof, as may be required of the Developer and all entities engaged in work that Developer is obligated to perform on the Residential Property and Park Property. Notwithstanding Developer's obligation pursuant to this Section, Redevelopment Agency and/or City shall be responsible for the procurement and maintenance of each permit, license or other authorization that may be required for the Redevelopment Agency Remediation and the performance of any Redevelopment Agency or City obligations required by this Agreement.

5.10    Progress Reports.  Until construction of all of the Project and Offsite Improvements has been completed, the Developer shall provide quarterly written reports regarding construction progress in such detail as the City may reasonably require.

5.11    Use and Maintenance.  The Developer agrees to use the Residential Property for the purposes set forth in this Agreement and to maintain all portions of the Residential Property and improvements, lighting, paving and landscaping for the Park Property in good repair and in a neat, clean and orderly condition.  This covenant shall appear in the Grant Deed and shall run with the land, and shall be binding on the successors and assigns of the Developer.  The Developer shall expressly assign this maintenance and use covenant to the homeowner's association to be formed for the Developer.

5.12    Sales and Use Tax Allocations.

5.12.1    Subpermit.  The Developer shall require that its contractors and subcontractors exercise their option to obtain a Board of Equalization subpermit for the jobsite and allocate all eligible use tax payments to the City.  Prior to beginning the construction of the Project, the Developer shall require that its contractor and subcontractors provide the City with either a copy of the subpermit or a statement that use tax does not apply to their portion of the job.

5.12.2    Direct Payment.  The Developer shall review the direct payment process established under California Revenue and Taxation Code 7051.3 and, if eligible, use the permit so that the local share of its use tax payments is allocated to the City.  The Developer shall provide the City with either a copy of the direct payment permit or a statement certifying ineligibility to qualify for the permit.  The Developer shall further work with the Redevelopment Agency to inform all tenants and operators of facilities in the Project about the direct payment permit process and require their participation if qualified.

6        REPRESENTATIONS, WARRANTIES AND COVENANTS.

6.1    City's Representations, Warranties and Covenants.  City, in its capacity as a seller of the Residential Property and not in its regulatory capacity, hereby represents, warrants and covenants to Developer as follows, all of which shall survive the Close of Escrow and which are subject to any investigation or knowledge of Developer prior to the Close of Escrow:

6.1.1    Authority.  City owns the Residential Property in fee simple and has the right, capacity, power and authority to enter into and carry out the terms of this Agreement.  To the best of City's knowledge, other than as shown in the Proforma, no other person, firm or entity other than Developer has any rights in or rights to acquire the Residential Property.  City has not alienated, encumbered, transferred, leased, assigned or otherwise conveyed its interest in the Residential Property or any portion thereof except as set forth in the Proforma, nor has the City entered into any agreement

733\12\172152.9                              23

to do so, nor shall City do so prior to the Close of Escrow. The entering into and performance by City of the transactions contemplated by this Agreement will not violate or breach any agreement, covenant or obligation binding on City. This Agreement has been duly authorized by City and duly executed by the parties signing on behalf of City.

6.1.2  Disclosure Documents. City have delivered to Developer copies of the documents listed on the attached Exhibit G (the "Document Schedule"), which to the best of City's knowledge constitute all non-privileged material documents in City's possession or control relating to the ownership, condition, development and operation of the Property and the rights included in or related to the Property.

6.1.3  Physical Condition. To the best of City's knowledge, the Property is free of any material physical defects or conditions, including Hazardous Substances, that would preclude or materially limit the development of the Project except as disclosed in any of the documents listed on the Document Schedule.

6.1.4  Liens. To the best of City's knowledge, there are no mechanic's or materialman's liens or similar claims or liens now asserted against the Residential Property for work performed or commenced prior to the date hereof other than as described in the Proforma.

6.1.5  Suits/Actions. To the best of City's knowledge, there are no suits, administrative proceedings or governmental actions or investigations pending or threatened against or affecting City or the Residential Property that would prevent City from meeting any of its respective obligations under this Agreement. The parties each acknowledge that the RWQCB's administrative process and the cost recovery litigation related to Hazardous Substances are on-going.

Each of the representations and warranties made by City in this Agreement, shall be true and correct in all material respects on the date hereof, and shall be deemed to be made again as of the Close of Escrow, and shall then be true and correct in all material respects. City makes no representation or warranty other than those specifically and expressly stated in this Section 6.1. City makes no representation, express or implied, that the Residential Property or its condition is suitable for the Developer's intended use. The phrase "to the best of City's knowledge" as used in this Agreement, refers only to the actual knowledge of Steven A. Duran, Community and Economic Development Director, Alan Wolken, Community and Economic Development Deputy Director, Gary Hembree, Senior Development Project Manager and Judith Battle, Principal Planner, without having conducted any independent investigation or study. City shall notify Developer within twenty (20) days of becoming aware of them of any facts or circumstances which are contrary to the foregoing representations and warranties contained in this Section 6.1, or which come to the knowledge of City's representatives identified above and fall within the scope of representations made to the best of City's knowledge. In the event such facts or circumstances are materially adverse to Developer's completion of the transaction contemplated by this Agreement, following notice to City and a reasonable opportunity to cure, in no event less than thirty (30) days, Developer shall have the right to

terminate this Agreement in addition to all other remedies. If Developer so terminates this Agreement, City shall be entitled to the Planning Documents pursuant to Section 8.4 and to retain the Initial Deposit and interest thereon, and the Additional Deposit, if any, with interest thereon, shall be returned to Developer by Escrow Holder. City agrees to indemnify, protect, defend (with legal counsel reasonably acceptable to Developer) and hold Developer and its employees, partners, directors, officers, affiliates, agents and representatives harmless from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature relating to or arising out of a breach of City's representations and warranties set forth in this Agreement, including without limitation attorneys' fees and costs incurred in connection therewith or to enforce this indemnity agreement. City's indemnity obligation shall survive the termination of this Agreement and the Close of Escrow.

      6.2    <u>Developer's Representations and Warranties</u>. Developer hereby represents and warrants to City and Redevelopment Agency as follows, all of which shall survive the Close of Escrow and which shall be subject to any investigation or knowledge of City and Redevelopment Agency prior to the Close of Escrow:

      6.2.1    <u>Authority</u>. Developer is a corporation duly organized, validly existing and in good standing in the State of Pennsylvania, is duly authorized to conduct business in the State of California, and has the capacity and full power and authority to enter into and carry out the agreements contained in, and the transactions contemplated by, this Agreement, and this Agreement has been duly authorized and executed by Developer and, upon delivery to and execution by City and Redevelopment Agency, shall be a valid and binding Agreement of Developer.

      6.2.2    <u>Suits/Actions</u>. To the best of Developer's knowledge, there is no pending or threatened suit, action or arbitration, or legal, or administrative, proceeding, including but not limited to eminent domain, condemnation or assessment district, or any judgment or moratorium which adversely affects Developer's anticipated development of the Residential Property.

      6.2.3    <u>No Bankruptcy</u>. Developer and any entity or person that owns or controls Developer are not bankrupt or insolvent under any applicable Federal or state standard, have not filed for protection or relief under any applicable bankruptcy or creditor protection statute and have not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statute.

      6.2.4    <u>Representations/Warranties</u>. Developer confirms its representations and warranties as set forth in Sections 4.9.2, 4.9.3 and 10.27.

      6.2.5    <u>Financial Condition</u>. Developer's most recent audited financial statements has not changed from the date of the applicable financial statements in a manner which would materially and adversely affect its ability to perform its obligations under this Agreement.

Each of the representations and warranties made by Developer in this Agreement, shall be true and correct in all material respects on the date hereof, and shall be deemed to be made again as of the Close of Escrow, and shall then be true and correct in all material respects. Developer shall notify City and Redevelopment Agency of any circumstances which are contrary to the foregoing representations and warranties contained in this Section 6.2. In the event the facts or circumstances are materially adverse to City's and Redevelopment Agency's completion of the transaction contemplated by this Agreement, following notice to Developer and a reasonable opportunity to cure, in no event less than thirty (30) days, City and Redevelopment Agency shall have the right to terminate this Agreement in addition to all other remedies. If City or Redevelopment Agency so terminates this Agreement, City shall be entitled to the Planning Documents pursuant to Section 8.4 and to retain any Deposits and Escrow Holder shall deliver the Additional Deposit, if any, with interest to the City, in addition to any other rights under law or in equity City or Redevelopment Agency may pursue. Developer agrees to indemnify, protect, defend (with legal counsel reasonably acceptable to City and Redevelopment Agency) and hold City, Redevelopment Agency and their employees, officers, affiliates, agents and representatives harmless from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature relating to or arising out of a breach of Developer's representations and warranties set forth in this Agreement, including without limitation attorneys' fees and costs incurred in connection therewith or to enforce this indemnity agreement. Developer's indemnity obligation shall survive the termination of this Agreement and the Close of Escrow.

7    CONDEMNATION

If, prior to the Close of Escrow, any portion of the Residential Property is taken by any entity by condemnation or with the power of eminent domain, or if the access thereto is reduced or restricted thereby (or is the subject of a pending taking which has not yet been consummated), City shall immediately notify Developer of such fact. In such event, Developer shall have the right, in Developer's sole discretion, to terminate this Agreement and the Escrow upon written notice to City and Escrow Holder not later than seven (7) business days after receipt of City's notice thereof. If this Agreement and the Escrow are so terminated, the Additional Deposit with interest, shall be returned by Escrow Holder to the Developer, the Initial Deposit with interest shall be retained by the City and neither party shall have any further rights or obligations hereunder, except for payment of escrow cancellation fees which shall be borne equally by Developer and City and Developer's obligation to provide the Planning Documents to City pursuant to Section 8.4. Alternatively, Developer may proceed to consummate the transaction provided for herein at Developer's sole election, in which event City shall assign and turn over, and Developer shall be entitled to receive and keep, any and all awards made or to be made in connection with such condemnation or eminent domain, and the parties shall proceed to the Close of Escrow pursuant to the terms hereof, without any reduction in the Purchase Price. In the event Developer elects to consummate the transaction but City retains any such award, in breach of this Section, and neither party is otherwise in default under this Agreement, Developer may elect to consummate the

purchase of the Residential Property, and the Purchase Price shall be reduced by the amount of the award wrongfully retained by City.

8    REMEDIES.

8.1    Default.  Developer's failure to construct the Project or the Offsite Improvements within the time frames set forth above and in accordance with this Agreement, unless prevented or otherwise caused by the presence of Hazardous Substances, shall be a default under this Agreement subject to the remedies set forth below in Sections 8.2, 8.3 and 8.4 as well as the remedies provided elsewhere in this Agreement and any other remedies at law or in equity, including without limitation, damages to the City and the Redevelopment Agency.  The provisions of this Section 8 shall survive Close of Escrow and shall not be deemed merged into any instrument or conveyance delivered at the Close of Escrow.

8.2    Right of Reverter.  If following the Close of Escrow, the Developer, after written notice to Developer and a thirty (30) day opportunity to cure (provided that if the cure cannot reasonably be completed within thirty (30) days and Developer commences the cure within thirty (30) days, Developer shall not be in default if it diligently prosecutes the cure to completion), fails to begin construction of the Project, by the Commencement Date, unless prevented or otherwise caused by the presence of Hazardous Substances, the City may re-enter and take possession of the Residential Property or any portion thereof with all improvements thereon for which construction has not been commenced or completed pursuant to the requirements of this Agreement without payment or compensation to Developer, and revest in the City the estate theretofore conveyed to the Developer.  The interest created pursuant to this Section 8.2 shall be a "power of termination" as defined in California Civil Code Section 885.010, and shall be separate and distinct from the City's option to purchase the Residential Property under the same or similar conditions specified in Section 8.3.

The rights granted in this Section 8.2 shall be subject to and be limited by and shall not defeat, render invalid, or limit the rights or interests of any holders or mortgagees under any mortgage or deed of trust encumbering the Residential Property.

Upon revesting in the City of title to the Residential Property or any portion thereof as provided in this Section 8.2, the City shall use its best efforts to resell the Residential Property or applicable portion thereof and as soon as possible, in a commercially reasonable manner to a qualified and responsible party or parties (as determined by the City) who will assume the obligation of making or completing the Project in accordance with the uses specified for such Residential Property in this Agreement and in a manner satisfactory to the City.  Upon such resale of the Residential Property or any portion thereof the proceeds thereof shall be applied as follows:

8.2.1  First, to reimburse the City and Redevelopment Agency on their behalf for all costs and expenses incurred by the City and Redevelopment Agency, including but not limited to salaries of personnel and legal fees incurred in connection

with the recapture, management, and resale of the Residential Property or any portion thereof (but less any income derived by the City and/or Redevelopment Agency from any part of the Residential Property in connection with such management); all taxes, installments of assessments payable prior to resale, and applicable water and sewer charges with respect to the Residential Property or any portion thereof (or, in the event the Residential Property or any portion thereof is exempt from taxation or assessment or such charges during the period of ownership by the City, an amount equal to the taxes, assessments, or charges that would have been payable if the Residential Property or any portion thereof were not so exempt); any payments made or necessary to be made to discharge any encumbrances or liens existing on the Residential Property or any portion thereof at the time of revesting of title in the City or to discharge or prevent from attaching or being made any subsequent encumbrances or liens due to obligations, defaults, or acts of the Developer, its successors or transferees; any reasonable expenditures made or obligations incurred with respect to the making or completion of the Project or any part thereof on the Residential Property; and any amounts otherwise owing the City and the Redevelopment Agency by the Developer and its successors or transferee.

8.2.2    Second, to reimburse the City and the Redevelopment Agency for damages to which it is entitled under this Agreement by reason of the Developer's default.

8.2.3    Third, to reimburse the Developer, its successor or transferee, up to the amount equal to:

(a)The payment made to the City for the Residential Property; _plus_

(b)The fair market value of the new improvements the Developer has placed on the Residential Property or applicable portion thereof; _less_

(c)Any gains or income withdrawn or made by the Developer from the Residential Property or applicable portion thereof, or the improvements thereon.

Notwithstanding the foregoing, the amount calculated pursuant to this Section 8.2.3 shall not exceed the fair market value of the Residential Property or applicable portion thereof, together with the improvements thereon as of the date of the default or failure which gave rise to the City's exercise of the right of reverter.

8.2.4    Any balance remaining after such reimbursements shall be retained by the City as its property.

The rights established in this Section 8.2 are to be interpreted in light of the fact that the City will convey the Residential Property to the Developer for development of the Project and not for speculation.  The rights established in this

733\12\172152.9                               28

Section 8.2 shall terminate and shall have no force or effect as of the date the City issues a certificate of occupancy for the last residential unit in the Project.

     8.3    <u>Option to Purchase, Enter and Possess</u>. The City shall have the additional right at its option to purchase, enter and take possession of the Residential Property or any portion thereof owned by the Developer with all improvements thereon (the "Option"), if after Close of Escrow after written notice to Developer and a thirty (30) day opportunity to cure any defaults (provided that if the cure cannot reasonably be completed within thirty (30) days and Developer commences the cure within thirty (30) days, Developer shall not be in default if it diligently prosecutes the cure to completion), the Developer fails to begin construction of the Project by the Commencement Date.

     To exercise this Option, the City shall pay to the Developer in cash an amount equal to:

          (a)    The purchase price paid to the City by the Developer for the Residential Property; <u>plus</u>

          (b)    The fair market value of any new improvements existing on the Residential Property at the time of exercise of the Option; <u>less</u>

          (c)    Any gains or income withdrawn or made by the Developer from the applicable portion of the Residential Property or the improvements thereon; <u>less</u>

          (d)    The value of any liens or encumbrances on the applicable portion of the Residential Property which the City assumes or takes subject to said liens; <u>less</u>

          (e)    Any reasonable clearly-identifiable damages to which the City and Redevelopment Agency is entitled under this Agreement by reason of Developer's default.

     The rights established in this Section 8.3 shall terminate and shall have no force or effect as of the date the City issues a certificate of occupancy for the last residential unit in the Project.

     8.4    <u>Plans, Data and Approvals</u>. If this Agreement is terminated, then the Developer shall promptly (within five (5) days of such termination) assign and deliver to the City copies of all plans, studies, reports, data and specifications for the Project and Offsite Improvements, all permits and approvals obtained in connection with the Project and Offsite Improvements, and all applications for permits and approvals not yet obtained but needed in connection with the Project and Offsite Improvements (collectively, the "Planning Documents") in the possession of or prepared by or for Developer for the Project or the Offsite Improvements. Developer shall execute any documents deemed necessary by City to assign and transfer Developer's right, title and interest in such documents to the City. The City or any other person or entity

designated by the City, subject to the rights of any consultant who may have prepared them, shall be free to use such Planning Documents, including Planning Documents previously delivered to the City, for any reason whatsoever without cost to the City. The Developer shall not be liable for any costs related to the Planning Documents that are incurred after the date of such assignment. However, if Planning Documents are used by the City or an entity designated by the City, neither the Developer nor its consultants shall be liable to the City or designated entity because of this use.

Developer shall use commercially reasonable efforts to include in all contracts and authorization for services pertaining to the planning and design of the Project and the Offsite Improvements an express waiver by the person or entity performing such services of any claims of Developer or any other interest in such plans and data and of any right to compensation or payment from the City in the event the City is entitled to the Planning Documents pursuant to the provision of this Section 8.4. Developer makes no representation or warranty and expressly disclaims any such representation or warranty regarding the accuracy, suitability or contents of any plans, data, drawings, reports or illustrations furnished to the City and the City agrees to look solely to the architect or engineer of such plans or drawings in the event of any claim, loss or damage related to, or arising out of, use of same.

9    MORTGAGE PROTECTION.

For purposes of this Section 9, the term "Mortgage" shall mean only a deed of trust, mortgage, or other method of security that complies with the provisions of this Section 9 and the term "Mortgagee" shall mean the holder of the Mortgage. Further, for purposes of this Section 9, all references to the term "Mortgagee" shall also mean any purchaser of the portion of the Residential Property subject to the Mortgage by means of a foreclosure sale of the Residential Property or transfer in lieu thereof by the Mortgagee and any successors and assigns of such parties. The term "Mortgaged Property" shall refer to those portions of the Residential Property owned by Developer that are subject to a particular Mortgage. The City shall not unreasonably withhold its approval of minor revisions to the mortgage protection provisions of this Section 9 as may be requested by lenders to the Project.

9.1    Interest Covered by Mortgage.  The Mortgage shall cover no interest in any real property other than Developer's interest in the Mortgaged Property and the Project on the Residential Property.

9.2    Rights Subject to Agreement.  All rights acquired by any Mortgagee, either before or after foreclosure or transfer in lieu thereof, shall be subject to each and all of the terms, covenants, conditions and restrictions set forth in this Agreement, none of which terms, covenants, conditions and restrictions are or shall be waived by the City or Redevelopment Agency except as specifically waived by the City or the Redevelopment Agency in writing or as otherwise provided in this Section 9.

9.3    Mortgagee Not Obligated to Construct Improvements.  The Mortgagee of any Mortgage shall in no way be obligated by the provisions of this

Agreement to construct or complete the Project or Offsite Improvements or to guarantee such construction or completion, nor shall any covenant or any other provision in the Grant Deed be construed so to obligate such Mortgagee. Nothing in this Agreement shall be deemed to construe, permit or authorize any such Mortgagee to devote the Mortgaged Property to any uses or to construct any improvement thereon other than those uses or improvements provided for or authorized by this Agreement.

9.4    Notice of Default to Mortgagee: Right to Cure.  If Developer creates a Mortgage on the Mortgaged Property then so long as such Mortgage remains unsatisfied of record, the following shall apply:

9.4.1  Notices of Default.  Whenever the Redevelopment Agency or City shall deliver any notice or demand to Developer with respect to any breach or default by Developer under this Agreement which would affect the Mortgaged Property or the completion of construction of the improvements on the Mortgaged Property, the Redevelopment Agency or City shall at the same time deliver a copy of such notice or demand to each Mortgagee who has previously made a written request to the Redevelopment Agency or City for such notice; provided, however, that failure to deliver such notice shall in no way affect validity of the notice sent to Developer as between the Redevelopment Agency, the City and Developer, unless cured by Mortgagee as hereafter provided.  Each such Mortgagee shall (insofar as the rights of the Redevelopment Agency and City are concerned) have the right, at its option, within ninety (90) days after the receipt of the notice, to cure or remedy or commence to cure or remedy any such default and to add the cost thereof to the security interest debt and the lien of its security interest. In the event there is more than one (1) such Mortgagee with respect to the Mortgaged Property, the right to cure or remedy a breach or default of Developer under this Section 9.4 shall be exercised by the Mortgagee first in priority or as the Mortgagees may otherwise agree among themselves, but there shall be only one (1) exercise of such right to cure and remedy a breach or default of Developer under this Section 9.4 with respect to each such default or breech.

9.4.2  Construction of Improvements.  Nothing contained in this Agreement shall be deemed to permit or authorize such Mortgagee to undertake or continue the construction or completion of the improvements (beyond the extent necessary to conserve or protect the improvements or construction already made) on the Mortgaged Property without (i) first having expressly assumed Developer's obligations to the Redevelopment Agency and City with respect to the applicable Mortgaged Property by written agreement reasonably satisfactory to the Redevelopment Agency and City; (ii) the submittal of evidence reasonably satisfactory to the Redevelopment Agency and City that such Mortgagee (or a third party procured by the Mortgagee and reasonably acceptable to the Redevelopment Agency and City) has the financial capacity necessary to perform such obligations; and (iii) the submittal of evidence reasonably satisfactory to the Redevelopment Agency and City that such Mortgagee (or a third party procured by the Mortgagee and reasonably acceptable to the Redevelopment Agency and City) has the construction expertise to complete Developer's construction obligations as set forth in this Agreement.  If the Mortgagee fails to satisfy all of the requirements in the foregoing clauses (i), (ii) and (iii) within

Mortgagee's ninety (90) day cure period, then such failure shall constitute an event of default under this Agreement giving rise to the Redevelopment Agency's or City's right to terminate this Agreement and reenter the Mortgaged Property as set forth in Section 8.2; provided, however, that any such reentry shall be subject to the Mortgagee's rights under that Section.

   9.4.3 Completion of Improvements. In the event Mortgagee assumes Developer's obligations as provided in Section 9.4.2, the Mortgagee in that event must agree to complete, in the manner provided in this Agreement, the improvements to which the lien or title of such Mortgagee relates; provided, however, that such Mortgagee shall not be bound by the provisions of any completion schedule of the improvements but shall only be required to complete any required improvements with due diligence.

   9.4.4 Foreclosure Proceedings. Notwithstanding anything to the contrary contained herein, upon the occurrence of an event of default by Developer hereunder, the Redevelopment Agency and City shall take no action to effect a termination of this Agreement without first giving to any Mortgagee written notice thereof and a reasonable time thereafter within which either (i) to obtain possession of the Mortgaged Property (including possession by a receiver) or (ii) to institute, prosecute and complete foreclosure proceedings with diligence or otherwise acquire the Mortgaged Property with diligence; provided, however, that if such default is reasonably susceptible of being cured at any time, Mortgagee shall commence and diligently prosecute such cure as a condition to the Redevelopment Agency's and City's taking no action as set forth above. A Mortgagee upon acquiring the Mortgaged Property shall be required promptly to cure all other events of default by the Developer relating to the Mortgaged Property then reasonably susceptible of being cured by such Mortgagee other than an event of default by Developer with respect to constructing the improvements, subject to Sections 9.4.2 and 9.4.3 above; provided, however, that: (i) such Mortgagee shall not be obligated to continue such possession or to continue such foreclosure proceedings after such events of default have been cured; (ii) nothing herein contained shall preclude the Redevelopment Agency or the City, subject to the provisions of this Section 9, from exercising any rights or remedies under this Agreement with respect to any other event of default by Developer during the pendency of such foreclosure proceedings; and (iii) such Mortgagee shall agree with the Redevelopment Agency and City in writing to comply during the period of such forbearance with such of the terms, conditions and covenants of this Agreement as are reasonably susceptible of being complied with by such Mortgagee.

   9.5 Right of the Redevelopment Agency and City to Cure Mortgage Default.

   9.5.1 Notice to the Redevelopment Agency. Developer agrees to have any Mortgage provide that the Mortgagee shall give notice to the Redevelopment Agency and City in writing by registered or certified mail of the occurrence of any default by Developer under the Mortgage, and that the Redevelopment Agency and City shall be given notice at the time any Mortgagee initiates any Mortgage foreclosure action. In

the event of any such default, the Redevelopment Agency and City each shall have the right to cure such default, provided that Developer is given sixty (60) days' prior written notice of the Redevelopment Agency's intention to cure such default. If the Redevelopment Agency or City shall elect to cure such default, Developer shall pay the reasonable out of pocket costs and expenses of the Redevelopment Agency and City in curing the default to the Redevelopment Agency and City upon demand, together with the interest thereon at the maximum interest rate permitted by law, unless (i) Developer cures such default within the cure period as may be provided under the Mortgage, or (ii) if curing the default requires more than the cure period provided under the Mortgage and Developer shall have commenced cure within such cure period after such notice (or such longer period as may be provided under the Mortgage), Developer shall have (A) cured such default within thirty (30) days or such greater time period as may be allowed by the Mortgage or Mortgagee after commencing compliance, or (B) obtained from the Mortgagee a written extension of time in which to cure such default, together with a separate written extension of time granting the Redevelopment Agency and the City reasonable additional time to cure such default if such default is not cured within such extension of time, and delivered executed copies thereof to the Redevelopment Agency and the City. Subject to the foregoing prior written notice requirement and compliance by the Redevelopment Agency and the City with the other provisions of this Section 9.5, Developer hereby authorizes the Redevelopment Agency and City in the Redevelopment Agency's name or the City's name, as applicable, without any obligation to do so, to perform any act required of Developer in order to prevent a default or acceleration under any Mortgage, or the taking of any foreclosure or other action to enforce the collection of the indebtedness secured by the Mortgage. Developer also agrees to have any Mortgage provide that such Mortgage is subject to all of the terms and provisions of this Agreement.

        9.5.2   <u>Right of the Redevelopment Agency and City to Satisfy Other Liens After Title Passes</u>. After the conveyance of title to the Residential Property to Developer and prior to the completion of the Project and Offsite Improvements, and after Developer has had a reasonable time to challenge, cure or satisfy any liens or encumbrances on the Mortgaged Property, the Redevelopment Agency and City shall have the right to satisfy any such liens or encumbrances; provided, however, that nothing in this Agreement shall require Developer to pay or make provision for the payment of any tax, assessment, lien or charge so long as Developer in good faith shall contest the validity or amount thereof, and so long as such delay in payment shall not subject for the Mortgaged Property to forfeiture or sale.

    10     GENERAL PROVISIONS.

        10.1   <u>Notice, Demands and Communication</u>. All notices and demands to or upon the respective parties made pursuant to this Agreement shall be in writing and shall be effective for all purposes upon receipt on any business day before 5:00 PM local time and on the next business day if received after 5:00 PM or on other than a business day, including without limitation, in the case of (i) personal delivery, (ii) delivery by messenger, express or air courier or similar courier, (iii) delivery by United States first class certified or registered mail, postage prepaid, and (iv) transmittal by facsimile

followed by a hard copy deposited in first class U. S. Mail the same day as facsimile, addressed as follows:

| | |
|---|---|
| City/Redevelopment Agency: | City of Richmond/Richmond Redevelopment Agency<br>1401 Marina Bay South<br>Richmond, CA  94804<br>Attn:  City Manger/Executive Director<br>Facsimile:  (510) 620-6542 |
| With a copy to: | Office of the City Attorney<br>1401 Marina Bay South<br>Richmond, CA  94804<br>Facsimile:  (510.) 620-6518 |
| Developer: | Toll Bros., Inc.<br>100 Park Place, Suite 140<br>San Ramon, CA 94583<br>Attn: James Meek & Jon Paynter<br>Facsimile:  (925) 855-9927 |
| With a copy to: | Toll Bros., Inc.<br>725 Town & Country Road, Suite 500<br>Orange, CA  92868<br>Attn:  James Boyd & Mark Foster<br>Facsimile:(714) 835-9685 |
| With a copy to: | Bingham McCutchen LLP<br>1333 N. California Blvd., Ste. 210<br>P.O. Box V<br>Walnut Creek, CA 94596-1270<br>Attn:  Edward Merrill<br>Facsimile:  (925) 975-5390 |

In this Section "business days" means days other than Saturdays, Sundays, and Federal, State and City legal holidays.  Such written notices, demands and communications may be sent in the same manner to such other addresses as the affected party may from time to time designate by mail as provided in this Section 10.1.  Receipt of communications by United States first class or registered mail shall be sufficiently evidenced by return receipt.  Receipt of communication by facsimile shall be sufficiently evidenced by a machine generated confirmation of transmission without notation of error.  In the case of illegible or otherwise unreadable facsimile transmissions, to the extent the sending party is discernible, the receiving party shall promptly notify the transmitting party of any transmission problem and the transmitting party shall promptly resend any affected pages.

10.2  <u>Conflict of Interests</u>. No member, official or employee of the City or the Redevelopment Agency shall make any decision relating to the Agreement which affects his or her personal interests or the interest of any corporation, partnership or association in which he is directly or indirectly interested.

10.3  <u>Non-Liability of Officials, Employees and Agents</u>. No member, official, employee or agent of the City or the Redevelopment Agency shall be personally liable to the Developer, or any successor in interest, in the event of any default or breach by the City or the Redevelopment Agency or for any amount which may become due to the Developer or successor or on any obligation under the terms of this Agreement.

10.4  <u>Legal Advice</u>. Each party has received independent legal advice from its attorneys with respect to the advisability of executing this Agreement and the meaning of the provisions hereof. The provisions of this Agreement shall be construed as to the fair meaning and not for or against any party based upon any attribution of such party as the sole source of the language in question.

10.5  <u>Time of the Essence</u>. Time shall be of the essence as to all dates and times of performance.

10.6  <u>Force Majeure</u>. Performance by any party of its obligations hereunder, including Close of Escrow, shall be excused during any period of "Permitted Delay." Permitted Delay shall mean delay beyond the reasonable control of the party claiming the delay (specifically excluding a party's financial inability to perform); including, but not limited to (a) acts of God, including without limitation earthquakes, floods, fire, weather conditions that are abnormal for the period of time and could not have been reasonably anticipated, and other natural calamities, (b) civil commotion; (c) riots or terrorist acts; (d) strikes, picketing or other labor disputes; (e) shortages of materials or supplies; (f) the discovery of underground or other unknown conditions which delay any work; (g) damage to work in progress by reason of fire, floods or other casualties; (h) failure, delay or inability of the other party to act; (i) vandalism; (j) moratoria or other delays caused by restrictions imposed or mandated by governmental entities, or (k) legal or administrative actions or inactions related to development of the Property, including but not limited to the Entitlements, environmental review of the Project, State Lands approvals, and Other Agency Approvals, or any other third party actions or claims that prevent or delay development of all or a portion of the Property. A Permitted Delay for any cause will be deemed granted if notice by the party claiming such delay is sent to the other within ten (10) days from the commencement of the cause and such delay of time is not rejected in writing by either of the other parties within five (5) days after receipt of the notice. Times of performance under this Agreement may also be extended by written agreement of the City Manager, Redevelopment Agency Executive Director and the Developer.

10.7  <u>Attorneys' Fees</u>. In the event that any party hereto institutes an action or proceeding for a declaration of the rights of the parties under this Agreement, for injunctive relief, for an alleged breach or default of, or any other action arising out of,

this Agreement, or the transactions contemplated hereby, or in the event any party is in default of its obligations pursuant thereto, whether or suit is filed or prosecuted to final judgment, the non-defaulting party or prevailing party shall be entitled to its actual attorneys' fees and to any court costs incurred, in addition to any other damages or relief awarded.

10.8    Assignment. Developer may not assign this Agreement and its rights and obligations hereunder without first obtaining City's written approval of such assignment. Any approved transferee shall have all the benefits and obligations that Developer has under this Agreement. This Agreement shall be binding only upon and shall inure to the benefit of the successors and permitted assignees of the parties to this Agreement. No assignment will relieve Developer of any of its obligations hereunder.

City will not withhold its consent to assignment to a partnership, corporation or other entity in which Developer maintains practical and managerial control and retains or holds at least a fifty percent (50%) ownership interest, provided that said assignee assumes all of the obligations of Developer and agrees to execute all documents, purchase the Residential Property and perform all other obligations of Developer under this Agreement as if such assignee were the original Developer hereunder and further provided that no such assignment shall be effective until City has received from Developer and approved in writing reasonable evidence that the requirements of this subsection have been met.

City's approval of a proposed assignment shall be based upon the proposed assignee's reputation, experience, financial resources and access to credit, and capability to successfully carry out the development of the Residential Property to completion.

10.9    City Regulatory Authority. Developer acknowledges and understands that Developer may be required to seek approvals of the City with regard to the proposed use and development of the Residential Property, acting in its regulatory capacity as the city in which the Residential Property is located. Nothing in this Agreement shall in any way limit the discretion of City in acting in that regulatory capacity, and no action or inaction by the City acting in that regulatory capacity shall be a breach or default under this Agreement.

10.10    Program Management. Upon the reasonable request of the City or Redevelopment Agency, Developer agrees to act as a program manager on behalf of the City or the Redevelopment Agency to manage and administer the City's or Redevelopment Agency's obligations under this Agreement, provided, however, Developer shall have no obligation under this Section 10.10 to undertake the Redevelopment Agency Remediation set forth in Sections 3.5.1. This program management shall be pursuant to a separate program management agreement to be entered into with terms and conditions satisfactory to all parties, in their sole discretion.

10.11 <u>No Partnership or Joint Venture</u>.  City and Redevelopment Agency shall not, by virtue of this Agreement, or any action performed pursuant to this Agreement, in any way or for any reason be deemed to be or have become a partner of the Developer in the conduct of its business or otherwise, or a joint venturer, nor will they be deemed by virtue of this Agreement to be partners or joint venturers with one another.

10.12 <u>Inspection of Books and Records</u>.  Upon ten (10) days written notice to Developer, the City and its agents have the right at all reasonable times to inspect and audit the books, records and all other documentation of the Developer pertaining to its obligations under this Agreement.  The Developer, upon ten (10) days written notice to City, also has the right at all reasonable times to inspect the books, records and all other documentation of the City pertaining to its obligations under this Agreement to the extent such items to be inspected are part of the public record.  The Developer and the City shall retain such books, records and documentation for a period of five (5) years after their creation.

10.13 <u>Provisions Not Merged with Deeds</u>.  None of the provisions of this Agreement are intended to or shall be merged by the Grant Deed(s) transferring title to any real Residential Property the subject of this Agreement from the City to the Developer or any successor in interest and such Grant Deed(s) shall not be deemed to affect or impair the provisions and covenants of this Agreement.

10.14 <u>Title of Parts and Sections</u>.  Any titles of the Sections or subsections of this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any part of its provision.

10.15 <u>Indemnity</u>.  The Developer shall indemnify, defend and hold the City and the Redevelopment Agency harmless against all claims made against them, causes of action, administrative proceedings, arbitrations or enforcement actions which arise out of or in connection with i) the ownership or occupancy, of the Residential Property subsequent to Closing, including but not limited to the Developer's introduction of Hazardous Substances, and ii) the development of or construction on the Park Property and the Residential Property by the Developer or the Developer's contractors, subcontractors, agents, employees or tenants, and all damages (direct or consequential), costs, losses, injuries, fines, penalties, liens, encumbrances, charges, liabilities, demands, judgments, obligations, and all costs and expenses incurred in connection therewith (including, but not limited to, attorneys' fees and costs), including without limitation any third party lawsuits regarding challenges to the approval of this Agreement and related environmental review under CEQA and the National Environmental Policy Act and Entitlements or any environmental review related to the Entitlements under the CEQA and the National Environmental Policy Act; provided, however, that this indemnity shall not extend to any claim arising solely from the City's or Redevelopment Agency's failure to perform their respective obligations under this Agreement or from the City's or the Redevelopment Agency's or their agents, contractors or employees, negligence or willful misconduct.

The City or Redevelopment Agency shall indemnify, defend and hold the Developer harmless against all claims made against them, causes of action, administrative proceedings, arbitrations or enforcement actions which arise out of or in connection with i) the ownership or occupancy of the Residential Property prior to Closing, including but not limited to the presence of Hazardous Substances, and ii) the Redevelopment Agency Remediation on the Park Property and the Residential Property by the City or Redevelopment Agency or the City or Redevelopment Agency's contractors, subcontractors, agents, employees or tenants, and all damages (direct or consequential), costs, losses, injuries, fines, penalties, liens, encumbrances, charges, liabilities, demands, judgments, obligations, and all costs and expenses incurred in connection therewith (including, but not limited to, attorneys' fees and costs); provided, however, that this indemnity shall not extend to any claim arising from the Developer's failure to perform its obligations under this Agreement or from the Developer's or its agents, contractors or employees, negligence or willful misconduct.

10.16  Insurance.  The Developer shall cause to have in full force and effect during any period when the Developer is entering the Property pursuant to Section 2.3 and during the construction of the Project and Offsite Improvements pursuant to this Agreement all insurance policies as set forth in the attached Exhibit H.

10.17  Real Estate Commission.  No party shall be responsible to any other party for any real estate commissions or brokerage fees which may arise from this Agreement or otherwise be incurred by the other party.  Without limiting the generality of the foregoing, the City and Redevelopment Agency shall not be responsible for any real estate commission or brokerage fees incurred by the Developer arising in connection with the acquisition of the Residential Property or any portion thereof by the Developer and the Developer shall indemnify, defend, and hold harmless the City and the Redevelopment Agency with respect to any liability related to such commission or fees. The provision of this Section shall survive termination of this Agreement.

10.18  Rights and Remedies Cumulative.  Except as otherwise expressly stated in this Agreement, the rights and remedies of the parties are cumulative, and the exercise or failure to exercise one or more of such rights or remedies by either party shall not preclude the exercise by it, at the same time or different times, of any right or remedy for the same default or any other default by the other party.

10.19  Waiver of Covenants, Conditions or Remedies.  The express waiver by one party of the performance of any covenant, condition or promise, or of the time for performing any act, under this Agreement shall not invalidate this Agreement nor shall it be considered a waiver by such party of any other covenant, condition or promise, or of the time for performing any other act required, under this Agreement.

10.20  Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provision shall continue in full force and effect unless the rights and obligations of the parties have been materially altered or abridged by such invalidation, voiding or unenforceability.

10.21 <u>Choice of Law/Venue</u>. This Agreement and each and every related document are to be governed by, and construed in accordance with, the laws, of the State of California. The parties agree that the venue for any actions or claims arising from this Agreement shall be Contra Costa County, California

10.22 <u>Recordation of Agreement/Filing of Notices</u>. The Developer consents to the recordation of the Memorandum in the records of the County Recorder of Contra Costa County against the Residential Property. The City shall file all applicable Notices of Exemption and/or Notices of Determination pursuant to CEQA no later than five (5) business days after each of the following events; (i) approval of this Agreement by the City and the Redevelopment Agency; (ii) approvals for the Redevelopment Agency Remediation and the Redevelopment Agency Demolition; (iii) approval of the Entitlements by the City.

10.23 <u>Action by the City and Redevelopment Agency</u>. Except as may be otherwise specifically provided herein, whenever any approval, notice, direction, consent, request, or other action by the City or the Redevelopment Agency is required or permitted under this Agreement, such action may be given, made, or taken by the City Manager/Redevelopment Agency Executive Director, the Community and Economic Development Director, or by any person who shall have been designated in writing to the Developer by either of the designated officials, without further approval by the City Council and the Redevelopment Agency board, and any such action shall be in writing. The City Manager/Redevelopment Agency Executive Director or the Community and Economic Development Director may also, at his or her discretion, agree in writing to modification of the dates by which actions are to be complete or to waive any terms and conditions of this Agreement, to make non-substantive amendments to this Agreement in furtherance of the goals and objectives of this Agreement or to make reasonable modifications to the Agreement requested by lenders to, or investors for, the Project. The City Manager/Redevelopment Agency Executive Director and the Community and Economic Development Director are authorized to execute on behalf of the City and the Redevelopment Agency, respectively, any ancillary documents and to take any action necessary or desirable to effectuate the intent of this Agreement, including without limitation, the Memorandum, the Grant Deed, the Escrow Agreement, escrow instructions and consents to the filing of Project Applications.

10.24 <u>No Third-Party Beneficiaries</u>. No person or entity other than the City, the Redevelopment Agency, the Developer, and their permitted successors and assigns shall have any right of action under this Agreement.

10.25 <u>Amendments</u>. The parties can amend this Agreement only by means of a writing signed by all parties.

10.26 <u>Operating Memoranda</u>. The parties acknowledge that the provisions of this Agreement require a close degree of cooperation, and that new information and future events may demonstrate that changes are appropriate with respect to the details of performance of the parties under this Agreement. The parties

desire, therefore, to retain a certain degree of flexibility with respect to the details of performance for those items covered in general terms under this Agreement. If and when, from time to time during the Term of this Agreement, the parties find that refinements or adjustments regarding details of performance are necessary or appropriate, they may effectuate such refinements or adjustments through Operating Memoranda approved by the parties which, after execution, shall be attached to this Agreement as addenda and become a part hereof. This Agreement describes some, but not all, of the circumstances in which the preparation and execution of Operating Memoranda may be appropriate.

Operating Memoranda may be executed on the City's/Redevelopment Agency's behalf by the City Manager/Redevelopment Agency Executive Director or the Community and Economic Development Director. Operating Memoranda shall not require prior notice or hearing, and shall not constitute an amendment to this Agreement. Any significant modification to the terms of performance under this Agreement shall be processed as an amendment of this Agreement in accordance with Section 10.25, and must be approved by the City Council and Redevelopment Agency board.

10.27 <u>Identity and Authority</u>. Each of the persons executing this Agreement on behalf of the Developer does hereby covenant and warrant: that the Developer is a duly authorized and existing Pennsylvania corporation, in good standing and authorized to transact business in the State of California; that the Developer shall remain in good standing; that the Developer has the full right, power and authority to enter into this Agreement and to carry out all actions on its part contemplated by this Agreement; that the execution and delivery of this Agreement were duly authorized by proper action of the Developer and no consent, authorization or approval of any person is necessary in connection with such execution and delivery or to carry out all actions on the Developer's part contemplated by this Agreement, except as have been obtained and are in full force and effect; and that this Agreement constitutes the valid, binding and enforceable obligation of the Developer.

10.28 <u>Counterparts</u>. This Agreement may be executed in counterparts and multiple originals.

10.29 <u>Entire Understanding of the Parties</u>. This Agreement, together with all Exhibits hereto, constitutes the entire understanding and agreement of the parties hereto with respect of the subject matter hereof, and supercedes all prior understandings or agreements. All exhibits referenced in this Agreement are incorporated into this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

CITY:

CITY OF RICHMOND,
a charter city

By: *Irma L. Anderson*
Name: *Irma L. Anderson*
Title: *Mayor*

REVIEWED BY:

City Attorney's Office

By: _____

ATTEST:

*Ursula Delon, Deputy*

City Clerk

DEVELOPER:

TOLL BROS., INC.,
 a Pennsylvania Corporation

By: _____
Name: *JAMES W. BOYD*
Title: *VICE PRESIDENT*

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

CITY:                                              DEVELOPER:

CITY OF RICHMOND,                                  TOLL BROS., INC.,
a charter city                                     a Pennsylvania Corporation


By:_____                       By:_____
Name:_____                       Name:_____
Title:_____                       Title:_____

                                                   By:_____
                                                   Name: H. SON PAYNTER
                                                   Title: V.P.


REVIEWED BY:

City Attorney's Office


By:_____

ATTEST:

_____
City Clerk



EXHIBIT A
PROPERTY DESCRIPTION
OCTOBER 31, 2003

TERMINAL ONE AT BRICKYARD COVE
POINT RICHMOND, RICHMOND, CALIFORNIA

NOTE:
THE PROPERTY INFORMATION SHOWN HEREON IS NOT BASED
UPON A FIELD SURVEY. IT IS AN APPROXIMATE BOUNDARY
COMPILED FROM AVAILABLE PUBLIC RECORD DATA.

Toll Brothers
America's Luxury Home Builder



EXHIBIT C

SCOPE OF DEVELOPMENT

**Vision For Terminal One:**

Toll Brothers will build an exceptional residential community with a minimum of 242 luxury condominiums of a quality similar to the *Villas @ Dublin Ranch.* More units may be allowed if within the approximate density of 21 dwelling units to the net buildable acre. This community will offer a unique blend of high quality for-sale condominium development with open space and recreational amenities that compliment the existing amenities and properties in the Point Richmond area and beyond. Brickyard Cove Road shall be improved with visual and landscaping standards consistent with the *Villas @ Dublin Ranch* within the constraints of the right-of-way. Toll Brothers design of the Project includes public pedestrian access to the pier, and convenient access to surrounding parks, trails, shoreline, yacht club, marina and community amenities. Toll will provide elegantly landscaped common areas with lighted walkways and benches, and all landscaping and recreational area maintenance provided by the HOA. Special attention will be given to pedestrian walkways, which offer seamless connectivity to the numerous amenities available and create a unique community. The condominiums will be in approximately 10 Villa buildings located on-site to capture the spectacular, sweeping views of the San Francisco Bay skyline, Treasure Island, Angel Island, Mount Tamalpais, Regional Shoreline Park, Marina and Yacht Club. A conceptual plan of this vision is attached to this Exhibit C.

**Minimum Project Expectations:**

Toll Brothers plans to develop a high quality residential community at Terminal One Project comprised of the following features.

| | |
|---|---|
| **Land Use:** | Minimum of 242 luxury market rate for-sale condominiums constructed over garages, with a density consistent with the existing General Plan designations applicable to the Property. |
| **Unit Size:** | Units will range in size from approximately 1,200 – 2,500 SF. |
| **Parking:** | Parking will exceed City of Richmond parking requirements and will consist of at least one garage space per unit with the balance of parking provided as surface spaces. Subject to Other Agency Approvals, residents and guests of the Project will not be precluded from non-exclusive use of any parking on the Park Property. |
| **Open Space:** | Toll to provide surface improvements to the City-owned 1.9 acre Park Property which shall include landscaping the park suitable for a passive park and may include tennis courts and paved parking spaces. Toll may construct a public multipurpose clubhouse type |

building on the Park Property which will be available to the City and the HOA for functions. Toll will provide maintenance of the park and related facilities until such maintenance responsibilities are transferred to the HOA.

**Public Amenities:** Toll Brothers will install surface improvements on the City owned public pier once the Redevelopment Agency has completed the Redevelopment Agency Demolition.

**Infrastructure:** Toll Brothers will install on-site and limited off-site infrastructure, extensions, and/or connections to existing infrastructure, or provide new on-site facilities to serve the Project.

- Brickyard Cove Road: Toll will construct surface improvements to Brickyard Cove Road from Dornan Drive to the Toll community, Seacliff at Point Richmond, retaining two lanes without a median, and the Road will be dedicated to the City.

- Sewer and Water: The Project will rely on existing and available sewer and water capacity.

**Local Ordinances:** Terminal One is a Redevelopment Project. Toll Brothers will comply with applicable City Ordinances. The Project will be subject to Residential Prevailing Wage Rate and City of Richmond First Source Agreement Bid Procedures, and Toll will work with local prevailing wage outreach consultants to provide a current subcontractor data base and manage and document Toll's efforts.

**Customary Fees, Credits and Exactions:** Environmental and development approvals would be subject to credits, fees (including any in lieu fees), exactions and dedications required under City rules, regulations and policies applicable City-wide, applied in a consistent manner with recent and current projects similar in nature to the Project.

EXHIBIT D

SCHEDULE OF PERFORMANCE

This Schedule of Performance summarizes the schedule for various activities under the Land Development Agreement (the "Agreement" or the "LDA") to which this exhibit is attached.   In the event of any inconsistencies between the provisions of the Agreement and this Schedule of Performance, the provisions of the Agreement shall prevail.

Whenever this Schedule of Performance requires the submission of plans or other documents at a specific time, such plans or other documents, as submitted, shall be complete and adequate for review by the City or other applicable governmental entity within the time set forth herein.  Prior to the time set forth for each particular submission, the Developer shall consult with City staff informally as necessary concerning such submission in order to assure that such submission will be complete and in a proper form within the time for submission set forth herein.

| | | |
|---|---|---|
| 1. | Agreement Effective Date. | Date of Redevelopment Agency Board/City Council approval of Agreement. |
| 2. | Parties open escrow. | Within 3 business days of approval of Agreement. |
| 3. | City files and posts Notices of Exemption/Determination with County Clerk. | Within 5 business days of approval of Agreement. |
| 4. | City approves Developer's request for right of entry on the Residential Property to conduct investigations, inspections and tests during the time Redevelopment Agency is conducting the Redevelopment Agency Remediation. | Within 10 business days after City's receipt of notice of request for access . |
| 5. | Developer completes review of Proforma and notifies City of any objections to title. | Within 60 days after receipt of Proforma. |
| 6. | City notifies Developer if it will not remove objections to title. | Within 60 days after receipt of Developer's notice regarding objections to title. |
| 7. | Redevelopment Agency  secures financing commitment per Section 3.5.4 of the Agreement. | By February 1, 2004, but not later than December 31, 2004. |

| | | |
|---|---|---|
| 8. | Developer surveys the Property and applies to City to establish Residential Property as a separate legal parcel. | As part of the Entitlement process and after the date the Redevelopment Agency informs Developer that it has obtained financing for the Redevelopment Agency Remediation, but no later than Close of Escrow. |
| 9. | Developer prepares documents necessary to apply to City for City's vacation or closure of Dornan Drive pursuant to Section 3.4 of the Agreement. | No later than 60 days after the date of the Redevelopment Agency informs Developer that it has obtained financing for the Redevelopment Agency Remediation |
| 10. | Redevelopment Agency completes termination of leases and removal of Red Oak Victory Ship. | Prior to Close of Escrow. |
| 11. | Redevelopment Agency completes Redevelopment Agency Remediation. | Prior to Close of Escrow. |
| 12. | Redevelopment Agency obtains all required approvals under local, state and federal regulations for the Redevelopment Agency Demolition per Section 3.6 of this Agreement. | Prior to Close of Escrow. |
| 13. | Redevelopment Agency completes the Redevelopment Agency Demolition per Section 3.6 of this Agreement. | Prior to Close of Escrow or if the work is not completed prior to Close of Escrow, the Redevelopment Agency, City and Developer shall enter into an escrow agreement to escrow funds at closing. |
| 14. | Redevelopment Agency takes all necessary actions with the SLC to remove any Trust-related clouds on title to the Residential Property as set forth in Section 3.7 of this Agreement. | Prior to Close of Escrow. |
| 15. | Developer prepares and submits to Planning Department and Redevelopment Agency Detailed Draft Concept Plan. | No later than 60 days after Step 7. |
| 16. | Redevelopment Agency or City contracts with EIR consultant for CEQA review of Entitlements. | No later than 60 days after Step 7. |
| 17. | Developer prepares and submits to Planning Department and Redevelopment Agency proposed Project Description for use in environmental document. | No later than 60 days after Step 7. |

| | | |
|---|---|---|
| 18. | Pre-application meeting with City and Developer to review Draft Detailed Concept Plan. | Within 15 days after Step 17. |
| 19. | Developer files Project Applications for the Entitlements, including applications for rezoning or conditional use permit, design review, and vesting tentative map approvals. | No later than 30 days after Step 17. |
| 20. | Developer prepares and submits development plan for Planned Area Development zoning or conditional use permit and vesting tentative map. | No later than 30 days after Step 17. |
| 21. | City reviews Project Approval applications and determines if complete. | Within 30 days of Steps 19 and 20. |
| 22. | City/Redevelopment Agency commence review and processing of Project Approvals and preparation of environmental document for Entitlements. | Within 30 days from Steps 19 and 20. |
| 23. | Preparation of environmental document. | Within 360 days of Step 22. |
| 24. | Developer prepares architectural and design materials, elevations, and landscaping plans for design review. | Within 180 days from Step 20. |
| 25. | City Council considers Final EIR certification and Project Approvals. | Within 30 days from completion of Step 23. |
| 26. | City posts Notice of Determination, if applicable. | Within 5 working days of Step 25. |
| 27. | Developer obtains all necessary Other Agency Approvals. | Prior to Close of Escrow. |
| 28. | City approves Final Map and grading permit. | Prior to Close of Escrow. |
| 29. | Close of Escrow. | 60 days after satisfactions of all conditions to Closing, but no later than June 29, 2005. |
| 30. | Developer commences grading. | Within 180 days of the later of: issuance of grading or demolition permit or Close of Escrow. |
| 31. | Developer obtains building permit and commences building construction. | Within 1 year of Close of Escrow. |
| 32. | Developer completes construction of the first phase of the residential units in the Project. | 1 year after issuance of building permit for first phase of the Project. |
| 33. | Developer completes construction of the last phase of the Project. | As soon as feasible given the then-current market conditions. |

EXHIBIT E

FORM MEMORANDUM OF AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

City of Richmond
Office of the City Attorney
1401 Marina Bay South
Richmond, CA  94804

No fee for recording pursuant
to Government Code Section 27380.

_____

(Space Above This Line For Recorder's Use)

MEMORANDUM OF LAND DISPOSITION AGREEMENT

THIS MEMORANDUM OF LAND DISPOSITION AGREEMENT is made as of _____ __, 200__, by and among the City of Richmond, a charter city (the "City"), the Redevelopment Agency of the City of Richmond, a public body, corporate and politic (the "Redevelopment Agency"), and Toll Bros., Inc., a Pennsylvania corporation  (the "Developer").  This Memorandum of Land Disposition Agreement confirms that the City, the Redevelopment Agency and the Developer entered into that certain Land Disposition Agreement, dated as of November __, 2003, (the "LDA").   The LDA sets forth certain rights and obligations of the City, the Redevelopment Agency and the Developer with respect to conveyance, development, operation, maintenance and transfer of ownership interests in that certain real property in Richmond, California, described in the attached Exhibit A  B

The City, the Redevelopment Agency and the Developer agree that this document will no longer be effective upon the City's issuance of a certificate of Completion of the last residential unit in the Project (as defined in the LDA), and agree to cooperate and sign any necessary documents to remove this document from title at such time.

AS OF THE DATE FIRST WRITTEN ABOVE, the parties evidence their agreement to the terms of this Agreement by signing below:

CITY:

CITY OF RICHMOND, a charter city

By: _____

Printed Name: _____

Its: _____

REDEVELOPMENT AGENCY:

REDEVELOPMENT AGENCY OF THE CITY OF RICHMOND, a public body, corporate and politic

By: _____

Printed Name: _____

Its: _____

DEVELOPER:

TOLL BROS., INC., a Pennsylvania corporation

By: _____

Printed Name: _____

Its: _____


By: _____

Printed Name: _____

Its: _____

STATE OF CALIFORNIA       )
                                )ss
COUNTY OF _____)

On _____, before me, _____, personally
appeared _____ personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.


_____


STATE OF CALIFORNIA       )
                                )ss
COUNTY OF _____)

On _____, before me, _____, personally
appeared _____ personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.


_____

                                 E-3

EXHIBIT A

Legal Description

EXHIBIT F

FORM OF GRANT DEED

Recording Requested By
And When Recorded Mail To:

Toll Bros., Inc.
100 Park Place, Suite 140
San Ramon, CA 94583
Attn: James Meek & Jon Paynter

GRANT DEED

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the City of Richmond, a charter city, ("Grantor") hereby grants and conveys to Toll Bros., Inc., a Pennsylvania corporation ("Grantee"), the real property (the "Property") described in Exhibit A attached hereto and incorporated in this Grant Deed ("Grant Deed") by this reference.

The Property is conveyed subject to the Land Disposition Agreement (the "LDA") entered into by and between Grantor and Grantee, dated November __, 2003, the terms of which are hereby incorporated herein.  The Property is further conveyed subject to certain title conditions, which were approved by Grantee pursuant to the LDA.

1.    The Grantee hereby covenants and agrees, for itself and its successors and assigns, that the Grantee and such successors and assigns shall promptly begin the redevelopment of the Property through the construction of the Project required to be constructed pursuant to the LDA (the "Project"), and that such construction shall be commenced within the times provided in the LDA.

2.    The Grantee covenants and agrees, for itself and its successors and assigns that there shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property and the Project, nor shall the Grantee itself or any person claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the Property and the Project.

All deeds, leases or contracts made relative to the Property and Project or any part thereof, shall contain or be subject to substantially the following non-discrimination clauses:

a.    In deeds:

"The grantee herein covenants by and for itself, its heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land herein conveyed, nor shall the grantee or any person claiming under or through the grantee establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the land herein conveyed.  The foregoing covenants shall run with the land."

b.    In leases:

"The lessee herein covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through the Grantee, and this lease is made and accepted upon and subject to the following conditions:

"That there shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the land herein leased, nor shall the lessee, or any person claiming under or through the lessee, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants or vendees in the land herein leased."

c.    In contracts:

"There shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land, nor shall the transferee, or any person claiming under or through the transferee, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants or vendees in the land."

3.    The covenants contained in Section 1 regarding construction shall remain in effect until the commencement of construction of the Project pursuant to LDA.  The covenants against discrimination contained in Section 2 shall remain in perpetuity.

4.    No violation or breach of the covenants, conditions, restrictions, provisions or limitations contained in this Grant Deed shall defeat or render invalid or in any way impair the lien or charge of any mortgage, deed of trust or other financing or security instrument; provided, however, that any successor of Grantee to the Property and Project shall be bound by such remaining covenants, conditions, restrictions, limitations and provisions, whether such successor's title was acquired by foreclosure, deed in lieu of foreclosure, trustee's sale or otherwise.

5.    The covenants contained in Sections 1 and 2 of this Grant Deed shall, without regard to technical classification or designation, legal or otherwise specifically provided in this Grant Deed, be, to the fullest extent permitted by law and equity, binding for the benefit and in favor of and enforceable by the Grantor, its successor and assigns, and any successor in interest to the Property and Project or any part thereof, and such covenants shall run in favor of the Grantor and such aforementioned parties for the entire period during which such covenants shall be in force and effect, without regard to whether the Grantor is or remains an owner of any land or interest therein to which such covenants relate. In the event of any breach of any of such covenants, the Grantor and such aforementioned parties shall have the right to exercise all of the rights and remedies, and to maintain any actions at law or suits in equity or other property proceedings to enforce the curing of such breach.

6.    Subject to and in accordance with the procedures and provisions of Section 8.2 of the LDA, the Grantor shall have the right, at its option, to repurchase and take possession of the Property hereby conveyed, or such portion thereof, with all Project thereon, and revest in the Grantor the estate conveyed to the Grantee, as provided in Section 8.2 of the LDA.

The Grantor shall have the right to institute such actions or proceedings as it may deem desirable for effectuating the purposes of this Section. Any delay by the Grantor in instituting or prosecuting any such actions or proceedings or otherwise asserting its rights under this Section shall not operate as a waiver of such rights or to deprive it of or limit such rights in any way (it being the intent of this provision that Grantor should not be constrained so as to avoid the risk of being deprived of or limited to the exercise of the remedy provided in this Section because of concepts of waiver, laches, or others), nor shall any waiver in fact made by the Grantor with respect to any specific default by the Grantee, its successors and assigns, be considered or treated as a waiver of the rights of the Grantor with respect to any other defaults by the Grantee, its successors and assigns, or with respect to the particular default except to the extent specifically waived.

The provisions of this Section 6 shall terminate on the date the City issues a certificate of occupancy for the last residential unit in the Project.

7.    Only the Grantor, its successors and assigns, and the Grantee and the successors and assigns of the Grantee in and to all or any part of the fee title to the Property and Project shall have the right to consent and agree to changes or to

eliminate in whole or in part any of the covenants contained in this grant deed or to subject the Property and Project to additional covenants, easements, or other restrictions.  For purposes of this section, successors and assigns of the Grantee shall be defined to include only those parties who hold all or any part of the Property and Project in fee title, and not to include a tenant, lessee, easement holder, licensee, mortgagee, trustee, beneficiary under deed of trust, or any other person or entity having an interest less than a fee in the Property and Project.

8.   Capitalized terms used in this Grant Deed, if not otherwise defined, shall have the meaning given to such terms in the LDA.

9.  In the event there is a conflict between the provisions of this Grant Deed and the LDA, it is the intent of the parties hereto and their successors in interest that the LDA shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Grant Deed this ____ day of _____, 200__.

GRANTEE:

TOLL BROS., INC., a Pennsylvania corporation

By: _____

Printed Name:_____

Its:_____

GRANTOR:

CITY OF RICHMOND, a charter city

By: _____

Printed Name:_____

Its:_____

STATE·OF CALIFORNIA           )
                                        ) ss

COUNTY OF _____ )

     On _____, _____, _____, before me,
_____, personally appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be
the persons whose names are subscribed to the within instrument and acknowledged to
me that they executed the same in their authorized capacities, and that by their
signatures on the instrument the persons or the entity upon behalf of which the persons
acted, executed the instrument.

WITNESS my hand and official seal.

_____

STATE OF CALIFORNIA           )
                                        ) ss

COUNTY OF _____ )

     On _____, _____, _____, before me,
_____, personally appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be
the persons whose names are subscribed to the within instrument and acknowledged to
me that they executed the same in their authorized capacities, and that by their
signatures on the instrument the persons or the entity upon behalf of which the persons
acted, executed the instrument.

WITNESS my hand and official seal.

_____

EXHIBIT A

Property Description

**[TO BE REVIEWED BY CITY AND TOLL]**

EXHIBIT G

DOCUMENT SCHEDULE

The Developer acknowledges receipt of the following documents pertaining to the Property and any additional documents available from the City of Richmond web site.

| No. | Document | Related Information | Date |
|---|---|---|---|
| 1. | Phase I Environmental Assessment | ➤ Treadwell & Rollo | 9/18/95 |
| 2. | Final Sampling and Analysis Plan, Phase II Environmental Site Assessment | ➤ Uribe & Associates | 11/98 |
| 3. | Predesign Geotechnical Report | ➤ Uribe & Associates | 3/99 |
| 4. | Report of Findings from Environmental Investigations at the Terminal One Site (Phase II), including Appendices Volumes I and II | ➤ Uribe & Associates | 8/99 |
| 5. | Request for Public Comments on City of Richmond's Application for an EPA Assessment Grant & RLF to serve the assessment & clean-up of Terminal One | ➤ City Council & Redevelopment Board Meeting of 3/11/03 | Unknown |
| 6. | Geomatrix Maps | ➤ Showing locations and concentrations of TPH, Benzene, PAH, metals, PCE, and Vinyl Chloride, in fill, bay mud and groundwater )based on Uribe data) | 4/00 |
| 7. | Letter from Geomatrix Consultants, Inc. to Cal. Dep't of Toxic Substances Control | ➤ Summarizing data collected by Geomatrix | 11/28/01 |
| 8. | Preliminary Title Report – Old Republic Title | ➤ Includes descriptions of easements on the Property (p.8) | 10/16/02 |

| No. | Document | Related Information | Date |
|-----|----------|---------------------|------|
| 9. | Preliminary Title Report | ➢ Title report includes parcel map | 12/29/97 |
| 10. | Richmond Mun. Code Chapter 2.28 | ➢ Ordinance re: Nondiscrimination Clauses in City Contracts | 7/96 |
| 11. | Richmond Mun. Code Chapter 2.52 | ➢ Ordinance re: Competitive Bidding, Contracting and Purchasing Procedures | 6/98 |
| 12. | Ordinance No. 26-01 N.S. | ➢ Chapter 2.56 of the Richmond Mun. Code establishes a Local Employment Program for Public Works contracts | 10/23/01 |
| 13. | Ordinance No. 27-01 N.S. | ➢ Amends Chapter 2.50 of the Richmond Mun. Code regarding opportunities for Richmond area businesses to compete for and participate in City funded contracts | 10/23/01 |
| 14. | Ordinance No. 29-01 N.S. | ➢ Adds Chapter 2.60 to the Richmond Mun. Code establishing Living Wage Ordinance | 10/30/01 Effective 7/1/02 |
| 15. | Office of Contract Compliance memorandum from City Attorney to All Purchasing Groups | ➢ Contract compliance for $10,000.00 and above purchase procedure (guidelines for City contracts for services above $9,999.99) | Unknown |
| 16. | Lease Amendment Agreement b/w City of Richmond & Parr-Richmond Terminal Co.[1] | ➢ Title Report identifies an unrecorded lease, dated 10/18/26, 5/21/28, and 5/21/43 | |

---

[1] Documents 16 through 28 were identified in Title Reports provided by the City of Richmond.

| No. | Document | Related Information | Date |
|-----|----------|-------------------|------|
| | | ➢ Assignment from Parr-Richmond Terminal Co. to Petromark, Inc. identifies an unrecorded agreement dated 8/20/69 b/w Parr-Richmond and Bray Oil Co. | 2/1/73 |
| 17. | Richmond Ordinance 10-75 N.S. | ➢ Adopted the Redevelopment Plan for Project 11-A (The Harbour) affecting a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 6/11/75 |
| 18. | Urban Renewal Plan for Project 11-A (The Harbour) | ➢ Redevelopment Plan | 6/9/75 |
| 19. | Ordinance 27-91 N.A. | ➢ Amended Ordinance 10-75 N.A.S. and affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 11/7/91 |
| 20. | Ordinance 13-99 N.A. | ➢ Affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 5/12/99 |
| 21. | Ordinance No. 31-99 | ➢ Affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 8/5/99 |
| 22. | Road and Utility Maintenance Agreement b/w Cove Investments and Innisfree Companies affecting Brickyard Cove Road | ➢ Affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 6/27/85 |
| 23. | Site Lease b/w City of Richmond & Richmond Joint Financing Powers Authority | ➢ Affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 8/1/96 |
| 24. | Facilities Lease b/w City of Richmond & Richmond Joint Financing Powers Authority | ➢ Affects a portion of Parcel One, all of Parcel Three, & an easement over Parcel Two | 8/1/96 |

| No. | Document | Related Information | Date |
|---|---|---|---|
| 25. | Trust Agreement b/w Richmond Joint Financing Powers Authority & Wells Fargo Bank, N.A. concerning Port Terminal Lease Revenue Bonds | | 8/1/96 |
| 26. | Lease agreement b/w City of Richmond & Pacific Bell Mobile Services | | 11/18/96 |
| 27. | Community Facilities District No.1 | | 7/18/97 |
| 28. | Any Managing Agreements, Operating Agreements, or amendments thereto | | Unknown |
| 29. | Additional Investigation Work Plan (Geomatrix Consultants) | ➢ Referred to in RFP as on file in City's Office of the Community & Economic Development and summarizes Uribe findings & proposes additional sampling | 8/00 |
| 30. | Report of Investigation Results & Work Plan for Additional Sampling (Geomatrix Consultants) | ➢ Referred to in RFP as on file in City's Office of the Community & Economic Development | 10/00 |
| 31. | Latham & Watkins Analysis of State Lands Issues | ➢ Memorandum regarding portions of Property subject to State Lands jurisdiction | 5/7/02 |
| 32. | Preliminary Title Report – Chicago Title Company | ➢ | 7/11/03 |
| 33. | Revised Quality Assurance Project Plan | ➢ Geomatrix Consultants | 10/00 |
| 34. | Geomatrix Maps | ➢ Geomatrix Consultants (showing locations and range of concentrations of COCs) | 1/03 |
| 35. | Draft Remedial Investigation Report | ➢ Geomatrix Consultants | 9/03 |
| 36. | Draft Health Risk Assessment | ➢ Geomatrix Consultants | 9/03 |

EXHIBIT H

INSURANCE REQUIREMENTS

Developer shall procure and maintain for the duration of the construction of the Project and Offsite Improvements insurance against all claims for injuries to person or damages to Property which may arise from or in connection with the development, construction or operation of the Project and Offsite Improvements or performance by the Developer, its agents, representatives or employees.

A.    Minimum Limits of Insurance

Developer shall maintain insurance limits not less than:

1.    Commercial General liability: $2,000,000.00 per occurrence for bodily injury, personal injury, and property damage, combined single limit and $2,000,000.00 aggregate limit, with a $3,000,000.00 umbrella policy limit.

2.    Workers' Compensation: pursuant to provisions of the Labor Code.

Developer shall furnish or caused to be furnished to the City evidence satisfactory to the City that each contractor with whom it has contracted for the performance of work on the Project carries workers' compensation insurance as required by law and complies with the above-required insurance limits.

B.    Other Insurance Provisions

All policies shall contain, the following provisions:

1.    City, Redevelopment Agency, and their officers, and employees shall be named as additional insureds on general liability policies as respects: liability arising out of activities performed by or on behalf Developer; and premises owned, occupied or used by Developer. The policies shall contain no special limitations on the scope of protection afforded to City, Redevelopment Agency, and their officers, officials, and employees.

2.    For any claims related to the Project, Developer's insurance coverage shall be primary insurance as respects City, Redevelopment Agency, and their officers, officials, and employees. Any insurance or self-insurance maintained by City, Redevelopment Agency, and their officers, officials, or employees shall be excess of Developer's insurance and shall not contribute with it.

3.    Any failure to comply with the reporting or other provisions of the policies shall not affect coverage provided to City, Redevelopment Agency, and their officers, officials or employees.

4.  Developer's insurance shall apply separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the insurer's liability.

5.  The Workers' Compensation insurers shall agree to waive all rights of subrogation against the  City, Redevelopment Agency and their agents, officers and employees for losses arising from work performed by the Developer for or on behalf of the City and/or Redevelopment Agency.

C.    Subcontractors

1.  Before permitting any subcontractors to perform work pursuant to this Agreement, Developer shall require subcontractors to furnish satisfactory proof that insurance has been issued and is maintained similar to that provided by Developer as may be applied to each subcontractor's work, provided, however, that subcontractors shall be required to provide commercial general liability insurance with $1,000,000.00 per occurrence for bodily injury, personal injury, and property damage, combined single limit, and $1,000,000.00 aggregate limit and workers' compensation insurance pursuant to the provisions of the Labor Code.

2.  For each design or engineering consultant, Professional Liability/Errors and Omissions coverage of not less than $1,000,000.000.

E.    Verification of Coverage

Developer shall furnish   City and Redevelopment Agency with an original certificate of insurance, in a form reasonably acceptable to the City and Redevelopment Agency, for all required policies and original endorsement of effective additional insured coverage for policies on which  City and/or Redevelopment Agency are included as an additional insured as required by this Exhibit, and shall furnish original certificates of insurance for all other required policies.  The endorsements are to be signed by the person authorized by the insurer to bind coverage on its behalf.  All endorsements and certificates are to be received and approved by City and Redevelopment Agency before work commences.

# FIRST AMENDMENT
## TO
## LAND DISPOSITION AGREEMENT

This Amendment to Land Disposition Agreement (the "*Amendment*") is entered into as of June *15*, 2006 by and among the City of Richmond, a charter city (the "*City*"), the Richmond Community Redevelopment Agency, a public body corporate and politic (the "*Agency*"), and Toll Bros., Inc., a Pennsylvania corporation (the "*Developer*").

## RECITALS

A.    The City, the Agency and the Developer entered into that certain Land Disposition Agreement, dated as of October 31, 2003 (the "*LDA*")

B.    Capitalized terms not otherwise defined herein are used as defined in the LDA.

C.    The Developer, the City and the Agency wish to amend the LDA to provide for an extension of the time of the Outside Closing Date to provide time to pursue a compromise between Developer and project opponents.

D.    This extension is without prejudice to Developer's, City's and Agency's positions regarding existing claims for Permitted Delay since April 30, 2005 under the LDA.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## AMENDMENT

**Article I    Extension of Outside Closing Date**. Pursuant to Section 10.23 of the LDA, the Parties agree that the Outside Closing Date, referenced in section 4.5 of the LDA and as Step 29 on Exhibit D of the LDA, is extended to October 1, 2006.

**Article II    Entire Agreement**. The LDA as amended by this amendment constitutes the entire agreement and understanding of the parties regarding the purchase of the property; and there are no other prior or contemporaneous written or oral agreements, undertakings, promises, warranties or covenants. The LDA, as amended by this amendment, may be amended or modified only by a written agreement subsequently executed by the City, the Agency and the Developer. To the extent any inconsistency exists between the terms of the LDA and this amendment, the terms of this amendment shall control. Except as modified by this amendment, the LDA shall remain in full force and effect and is ratified and confirmed in all respects.

First Amendment to Land Disposition Agreement

**Article III    Counterparts.**  This amendment may be executed in multiple identical counterparts, each of which shall be deemed an original, and counterpart signature pages may be assembled to form a single original document.  This amendment may be executed and delivered by the exchange of electronic facsimile copies or counterparts of the signature page, which shall be considered the equivalent of ink signature pages for all purposes.

**Article IV    Full Force and Effect.**  Except as expressly amended hereby, the LDA remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first written above.

CITY OF RICHMOND,
a charter city

By: _____

Name: __Irma L. Anderson_____

Title: __Mayor_____


RICHMOND COMMUNITY
REDEVELOPMENT AGENCY,
a public body corporate and public

By: _____

Name: _____Steven Duran_____

Title: _____Executive Director_____


REVIEWED BY:

By: _____
        City Attorney


REVIEWED BY:

By: _____
        Agency Attorney


ATTEST:

By: _____
        City Clerk


ATTEST:

By: _____
        Agency Clerk

2

First Amendment to Land Disposition Agreement

TOLL BROS., INC.,
a Pennsylvania Corporation

By: _R. M. Nelson_____

Name: _RICHARD M. NELSON_____

Title: _DIVISION PRESIDENT_____


By: _____

Name: _____

Title: _____

3

**EXHIBIT 2**



City of
**Richmond**

CITY MANAGER'S OFFICE

October 22, 2007

RECEIVED
OCT 3 1 2007
By No. CAL DIVISION

Richard M. Nelson
Division President
Toll Brothers, Inc.
100 Park Place, Suite 140 San Ramon, CA 94583

Re: **Land Disposition Agreement and Proposed Revisions**

Dear Mr. Nelson:

The City and the Agency are in receipt of your letter dated September 20, 2007. The City and Agency take strong exception to your views about your description of the current status of this project, and your proposed amendments to the Land Disposition Agreement ("LDA") and will be requesting a meeting with Toll Brothers in the near future to discuss your proposal.

As a threshold matter, we are compelled to correct the record regarding the Agency Remediation Work required by the LDA, and our compliance with those requirements. The Agency has completed its remediation of soils to residential standards. The only remaining item in this regard is the installation of the slurry wall delineating the deed restricted area of the site to be retained by the City as the Park Property, consistent with the new (pending) parcel map for the site. Soils of Concern by definition do not constitute a health risk and are simply nuisance materials that must be appropriately handled during site grading in site preparation for future development. This may include removal, depending upon the character of the soil materials. The treatment of Soils of Concern under the current warehouse site, as needed for the construction of the proposed shoreline road, is something that needs to be discussed, as this was never anticipated in Toll Brothers original proposal and entails treatment of soils on property to be retained by the City.

We next address your views about the execution of a Development Agreement. During the negotiations leading to the LDA, the issue of a Development Agreement was discussed and rejected by the City. As Toll Brothers has secured entitlements for the Point Richmond Shores project, there is no need for a Development Agreement. Using Development Agreements is not a customary practice for the City. However, modifications to the LDA will be necessary and are appropriate in order to reflect the approved and entitled project. Staff believes that an amended LDA is adequate authority for Toll Brothers to pursue project completion.

Finally, we reject your views regarding the proposed Outside Closing Date addressed in your letter. In fact, the Agency/City is prepared to complete the remaining Agency/City obligations, consistent with the LDA in order to transfer the property to Toll Brothers, Inc, as follows: (1) Closure of the State Lands issues predicated upon Toll Brothers approved site plan and legal delineation of the Residential Parcel(s); (2) Final approvals required for demolition of the Warehouse Buildings; and, (3) Installation of the Slurry Wall. The Agency/City has been working diligently to address its pre-closing obligations and we believe that the Agency/City can complete these remaining pre-closing conditions early in 2008 and finalize property transfer so that the project can move toward to completion. The Agency/City fully expects closing escrow within 60 days of the Agency/City completing the above pre-closing conditions.

Agency staff will be in contact with you to arrange a meeting to discuss project status and next steps.

Sincerely,

Bill Lindsay
City Manager


CC:    Louise Renee
       Randy Riddle
       Mary Renfro
       Steve Duran
       Alan Wolken

**EXHIBIT  3**



November 26, 2007

**Via Email & US Mail**

Mr. William Lindsay
City of Richmond
1401 Marina Way South
Richmond, CA 94804

Re:   Land Disposition Agreement

Dear Mr. Lindsay:

I am responding to your letter dated October 22, 2007, but not received by us until October 31, 2007.  We are quite surprised by your assertion that "The Agency has completed its remediation of soils to residential standards".  Going back to 2003, there is a long history showing that the City and Agency had a very different understanding of what constituted cleanup "as may be required by the RWQCB", sufficient to render "the Residential Property suitable for residential development".  That history includes Toll's offers to assist with some of the remaining cost.  We take your letter to be not only a surprising change of position but an unexpected rejection of those offers.

We know the City, the Agency and its consultants have been in regular contact with the Regional Water Quality Control Board regarding this matter.  Toll has learned of these contacts only after the fact, so it is possible we do not have a complete file on these contacts.  The latest we have seen on this issue is a July 24, 2006 letter from RWQCB to Mr. Hembree and Mr. Wolken.  I have enclosed a copy for your ease of reference.

I call your attention to the following excerpts from the fourth full paragraph on page 2:

"Please note, however inasmuch as significant portions of the cleanup program described in the UPRAP have not yet been yet been implemented.... The Executive Officer will consider issuance of final confirmation pursuant to Section 33459.3(c) only after all aspects of the clean up program envisioned in the UPRAP are completed.  Those steps are: (1) implementation of the soils management protocols for petroleum-impacted soil; (2) construction of the slurry wall/vapor barrier along the northern and eastern perimeter of the Southwest Tank Farm area; (3) submission of a technical report documenting implementation of those measures; (4) installation of the monitoring wells needed for the groundwater monitoring program, commencement of the monitoring program and documentation of those steps in a technical report; and (5) recordation of an appropriate, Executive Officer-approved deed restriction."  [I must note that Toll has the right to approve any deed restrictions].

Therefore, despite your assertion that the Agency has completed its remediation to residential standards, we, and apparently the RWQCB, do not believe the cleanup to be complete.

From the City's original RFP, through the negotiation of the Land Disposition Agreement, through many iterations of a proposed Amendment to the Land Disposition Agreement, to this day, it has been part of this deal that the Agency was to complete the cleanup of the property before Toll was required to take title to the property.

Mr. William Lindsay
**November 26, 2007**
Page 2


I take from your letter that the City does not like this part of the deal.  Toll has made a number of offers to assist the City and the Agency with their responsibility, including offering to manage the remaining portions of the cleanup on behalf of the Agency for no fee, to include much of the clean up work as a part of the grading without charge other than for the segregation and disposal of the petroleum impacted soils or other hazardous material encountered in the grading and finally to provide a financial subsidy for what was described to Toll as a gap in the Agency's and City's insurance for the cleanup.  I note these now rejected offers were made in the context of a far healthier real estate market than exists today.

In your letter you indicate that staff will contact Toll to arrange a meeting to discuss the project status.  I agree that a meeting would be useful at this time to discuss not only project status, but to also discuss the new (and we believe extraordinary) position by the City that its remediation obligations are satisfied.

Sincerely yours,

**TOLL BROTHERS, INC.**

Richard M. Nelson
Division President

Cc by email (with enclosure)

    Louise Renee
    Randy Riddle
    Mary Renfro
    Steve Duran
    Alan Wolken
    Mark Foster
    Doc Merrill
    Ben Helber
    Brett Foley

303263



# California Regional Water Quality Control Board
## San Francisco Bay Region

Linda S. Adams
*Secretary for
Environmental Protection*

1515 Clay Street, Suite 1400, Oakland, California 94612
(510) 622-2300 • Fax (510) 622-2460
http://www.waterboards.ca.gov/sanfranciscobay



Arnold Schwarzenegger
*Governor*

Date: July 24, 2006
File No. 07S0125 (MEJ)

Mr. Gary Hembree
Mr. Alan Wolken
City of Richmond Redevelopment Agency
1401 Marina Way South
Richmond, CA 94804
Alan_Wolken@ci.richmond.ca.us
Gary_Hembree@ci.richmond.ca.us

Subject:     Approval of Completion of Remedial Actions, Thermal Treatment of VOC
Impacts in the Southwest Tank Farm Area and Removal of PAH-Impacted Soil in
the Central Area, Terminal One Site, 1500 Dornan Drive, Richmond,
Contra                Costa County

Dear Messrs. Hembree and Wolken:

This letter responds to correspondence from Mr. Wolken, which enclosed the Geomatrix
Consultants' partial completion report for the in-situ thermal desorption process (ISTD) applied
in the VOC-impacted area (Southwest Tank Farm) at the Terminal One site, and also responds to
the second partial completion report submitted in connection with removal of the PAH-impacted
soils from the Central Area of the site.

The ISTD process and the excavation of the PAH-impacted soil were both specified in the
October 2004, Updated Proposed Remedial Action Plan (UPRAP). The October 2004, UPRAP
was submitted in connection with Task 1 in Order No. R2-2004-0045 and was approved by the
Executive Officer in a December 7, 2004, letter to Mr. Hembree. The completion reports have
been submitted in connection with Task 4 in Order No. R2-2004-0045.

Water Board staff have reviewed both the February 2006, Remedial Design Implementation
Plan-Partial Completion Report and the June 2006, Remedial Design Implementation Plan-
Second Partial Completion Report for the Site. We find that they appropriately document
implementation of the ISTD process for remediation of VOC impacts in the Southwest Tank
Farm area and the removal of PAH-impacted soils from the central portion of the site,
respectively. Both reports are hereby approved.

---

*Preserving, enhancing, and restoring the San Francisco Bay Area's waters for over 50 years*

♻ *Recycled Paper*

- 2 -

Further, and with respect to both the VOC impacts and the PAH impacts at the site, Water Board staff find that the cleanup measures implemented have achieved the cleanup standards for those contaminants as set forth in Sections B.1 and B.2 of Order R2-2004-0045.

Cleanup measures associated with the TPH cleanup standards established in Section B.2 have not yet been implemented as they will be implemented as part of grading and site preparation work prior to construction of the planned residential units.

Mr. Wolken's cover letter for the first partial completion report requested that the Board confirm, pursuant to Section 33459.3(b) of the Health and Safety Code, that the October 2004 UPRAP document was sufficient to support the immunity provided by the Polanco Act. Consistent with the prior approval of the UPRAP, Water Board staff hereby provides the requested confirmation pursuant to Section 33459.3(b).

Please note, however, that inasmuch as significant portions of the cleanup program described in the UPRAP have not yet been implemented, this letter does not provide final confirmation of the Polanco Act's immunities pursuant to Section 33459.3(c). The Executive Officer will consider issuance of final confirmation pursuant to Section 33459.3(c) only after all aspects of the cleanup program envisioned in the UPRAP are completed. Those steps are: (1) implementation of the soil management protocols for petroleum-impacted soil; (2) construction of the slurry wall/vapor barrier along the northern and eastern perimeter of the Southwest Tank Farm area; (3) submission of a technical report documenting implementation of those measures; (4) installation of the monitoring wells needed for the groundwater monitoring program, commencement of the monitoring program, and documentation of those steps in an appropriate technical report; and, (5) recordation of an appropriate, Executive Officer-approved deed restriction. Assuming these five steps are completed in a satisfactory fashion, final confirmation of Polanco Act immunities would be subject to on-going compliance with the groundwater monitoring program, timely submission of an acceptable five-year status report pursuant to Task C.7, and such other conditions as may be warranted based on the circumstances.

Although final confirmation of Polanco Act immunities cannot occur at this time, Water Board staff find that in light of the successful implementation of the ISTD process and the removal of PAH-impacted soil, no further actions other than those specified in the preceding paragraph are required from the Water Board staff's perspective in order for the proposed multi-family residential development to proceed on the Central and Northeast Tank Farm portions of the site and for the park/recreational use development to proceed on the Southwest Tank Farm portion of the site.

- 3 -

Should you have any comments or questions, please contact Mark Johnson or my staff at (510) 622-2493, mjohnson@waterboards.ca.gov.ca.gov.

Sincerely,

Digitally signed by Stephen Hill
DN: CN = Stephen Hill, C = US
Date: 2006.07.24 16:59:20 -07'00'

Bruce H. Wolfe
Executive Officer

cc: Mailing List

## Mailing List

Robert Doty
Cox, Castle & Nicholson LLP
555 Mongomery Street, 15th Floor
San Francisco, CA 94111-2585
Rdoty@coxcastle.com

Matt Covington
Piper Rudnick LLP
333 Market Street, 32nd Floor
San Francisco, CA 94105

Belynda B. Reck
O'Donnell and Shaeffer LLP
550 S. Hope Street, Suite 2000
Los Angles, CA 90071

Mike Heister
U.S. Dept. of Justice
Environments and Natural Resources Div.
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

William Wick
Wactor & Wick LLP
180 Grand Ave., Suite 950
Oakland, CA 94612

Richard Coffin
Barg, Coffin, Lewis & Trapp
Steuart Tower
One Market Street, Suite 2700
San Francisco, CA 94105

Steven H. Goldberg
Downey Brand LLP
555 Capitol Mall, 10th Floor
Sacramento, CA 95814

Andrew Mortl
Glynn & Finley LLP
100 Pringle Street
Walnut Creek, CA 94596

Heidi H. Bumpers
Jones Day
51 Louisiana Ave. N.W.
Washington, DC 20001

Barbara Cook
DTSC
700 Heinz Ave., Suite 200
Berkeley, CA 94710

TRAC
73 Belvedere Ave.
Richmond, CA 94801

Point Richmond N'hood Council
P.O. Box 70386
Richmond, CA 94807-0386

Mary Ellen Hogan
Holme, Robert and Owen
777 S. Figueroa St., Suite 3650
Los Angles, CA 90017

Information Repositories:
Richmond Redevelopment Agency and
Richmond Main Library